**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED APRIL 3, 2001**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                             No.   114799

STEVE CARBIN,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, C.J.

    We granted leave to consider defendant's claim that he was denied the effective assistance of trial counsel. The trial court, acting as trier of fact, found defendant guilty of first-degree criminal sexual conduct, MCL 750.520b; MSA 28.788(2), and sentenced him to a five to fifteen year term of

imprisonment. After a *Ginther* hearing[1] ordered by the Court of Appeals, the trial court denied defendant's motion for a new trial. The Court of Appeals then affirmed defendant's conviction in an unpublished opinion.[2] We affirm the judgment of the Court of Appeals. Defendant was not denied the effective assistance of trial counsel.

## I. Factual and Procedural Background

The victim, a woman in her mid-thirties, worked at a private recreation center in Detroit. On the evening of February 11, 1994, she stayed at work to close the facility. Sometime shortly after 9:00 p.m., when she believed that she was alone, she was attacked by two men who remained inside the building. One of those men forcibly raped her. At trial, the victim identified defendant as the man who raped her. She could not identify her other attacker. Defendant's trial counsel argued that the victim identified the wrong man and that defendant could not have committed the crime because he had been locked inside the Detroit Psychiatric Institute at the time the crime occurred.

The victim testified that she saw defendant's face in the light for one minute when the attack began and then again for

---

[1] See *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] Unpublished opinion per curiam, issued January 22, 1999, reh den March 25, 1999 (Docket No. 198969).

2

five or ten minutes during the rape itself.  She recognized defendant as one of the members of the recreation center.  Although she did not know his name, she explained that she had seen him around the center before the rape:

> *Q.*  How is it that you know [defendant] from the past?
>
> *A.*  Because he's a member at the center.  He came upstairs when we had the floor exercise, and I had to get the supervisor one time to ask him to leave.  And he left and stayed gone for awhile.  Then he came back to the center, he came back up again the night of the floor exercise, and the exercise instructor she came back to the ceramics table and she said that the ladies were uncomfortable and could I have the young man to leave.  And I went and told [the supervisor] again that he was upstairs and the ladies wanted him to leave.

The victim also explained that defendant frequently came to the recreation center to swim hours before the pool was scheduled to open and waited outside or in the lobby.  When the pool opened, defendant entered, but stayed at the shallow end.

The police did not immediately locate defendant because the recreation center did not have a picture of him.  After the February assault, the victim did not return to work at the recreation center until May.  She did not see defendant at the recreation center until September 1994.  When she first saw defendant at the recreation center after the rape, she immediately panicked and left the building.  By the time she

3

called the police from her house, the center had already closed for the evening. The next day, defendant once again came to the recreation center. This time, staff members alerted the police and defendant was arrested.

In addition to the victim's testimony, the prosecutor presented the testimony of the victim's friend, who arrived at the recreation center shortly after the rape and called the police, and two police officers who responded to the initial call. One of the police officers testified that they got the run at 9:35 p.m. and that they arrived at 9:40 p.m. The victim, who appeared shaken, told the officers that she had been assaulted by two men, one of whom she knew.

Defendant's only witness at trial was Yvonne Bond, director of medical records at the Detroit Psychiatric Institute. Bond testified that the institute's medical records indicated that defendant had been involuntarily hospitalized at the institute on the day of the crime. The records showed that defendant was present at 5:55 p.m. and 10:30 p.m. on that day and that he was "locked up" and "couldn't get out" during the interim hours.

On cross-examination, Bond admitted that patients had escaped from the Detroit Psychiatric Institute in the past. She also explained that patients were not locked in their individual rooms. Thus, she admitted, it was "conceivable"

4

that a patient could leave the sixth-floor psychiatric unit by making it past one set of locked doors to a hallway and a stairway leading down to the first floor exit. In addition to the stairway, a locked elevator could be accessed if the door happened to open while the elevator was in use.[3]

Regarding the medical records, Bond explained that detailed notes reflected defendant's activities at the institute between the hours of 7:00 a.m. and 3:30 p.m. on the day of the crime. These particular notes ceased at 3:30 p.m., which was the end of a shift. She also explained that the 10:30 p.m. notation indicated that a nurse had given defendant a certificate in his room. While she was never asked to explain her assertion that defendant was present at 5:55 p.m., Bond did testify that a record showed that a doctor had seen defendant at 5:10 p.m.

In making its findings of fact and conclusions of law, the trial court initially recounted the victim's testimony in detail. The judge explained that he believed the victim's testimony "just from listening to her." Her identification testimony was credible because she was familiar with defendant's face from previous observations. Finally, the

---

[3] Bond did not clearly testify (1) whether the locked elevator was located outside the set of locked doors leading to the psychiatric unit, or (2) whether the stairway itself was also locked.

trial court explained that the victim displayed no bias against the defendant that would have prompted her to falsify the story.

In rejecting defendant's alibi defense, the court opined that the detailed notes regarding defendant's whereabouts from 7:00 a.m. to 3:30 p.m. on the day of the crime established an "ironclad alibi" only for that specific period of time. In contrast, defendant had presented no records to establish conclusively his presence at the institute when the crime was committed. Regarding the institute's security measures, the trial court found that it was "not a lock down facility like the Wayne County Jail where there are guards and the like." Accordingly, the trial court reasoned that it was "just speculation" that defendant could not have left the facility to commit the crime. The trial court thus concluded that the prosecution had proven beyond a reasonable doubt that defendant was guilty of the crime of first-degree criminal sexual conduct.

After trial, while defendant's claim of appeal was pending, defendant's first appellate counsel moved for defendant's release on bond pending appeal. In response to the bond motion, the trial court took testimony for purposes of assessing the substantiality of defendant's grounds of appeal. Barbara Pettibone, a clinical social worker at

6

Detroit Psychiatric Institute, testified at the bond hearing that defendant, whom she recognized, had been involuntarily admitted to the institute at 1:30 p.m. on February 11, 1994, the day of the crime, and discharged on March 14, 1994. She explained that the institute was a "locked facility," which meant that a person attempting to enter from the outside would ordinarily have to pass through either three locked doors or one keyed elevator and one locked door—except during visiting hours from 6:30 p.m. to 8:00 p.m. when the doors were not locked. Pettibone also testified that she could not remember if she had previously been contacted by any other lawyer.

On cross-examination, Pettibone explained that the staff routinely conducted a bed check each night "around" 11:00 p.m., but that she was not positive regarding the exact time this was usually done. She also acknowledged that no one could conclude with certainty whether a new patient such as defendant, who may not have been well-known to the staff after the afternoon shift change, "left or stayed" during the visiting hours. Finally, Pettibone noted that maintenance workers were present at the facility with keys to the locked doors. After hearing Pettibone's testimony, the trial court granted defendant's motion and set bond in the amount of $25,000.[4]

_____

[4] The prosecutor informs that, despite the Court of Appeals affirmance of his conviction, defendant remains on

(continued...)

7

The Court of Appeals thereafter granted defendant's motion to remand to the trial court for a *Ginther* hearing. The trial court once again took testimony from Pettibone regarding the security measures in place at the Detroit Psychiatric Institute. In response to direct questioning from defendant's second appellate counsel, Pettibone testified that she recalled seeing defendant at the institute on the day he was admitted. In contrast to her testimony at the bond hearing that defendant had been admitted at 1:30 p.m. on February 11, 1994, Pettibone explained that the nursing notes indicated that defendant came to the facility at 7:00 a.m. on that day and was present through at least 3:00 p.m. She also stated, more conclusively than in her testimony at the bond hearing, that a bed check had occurred at 11:00 p.m.

With respect to the institute's security, Pettibone explained that defendant would have been kept in a locked ward, behind at least two locked doors. While acknowledging that patients have escaped in the past, she opined that it would be "very difficult," but "not impossible," for a person to escape, and "impossible" to get back in through the "two or three locked doors" without a key or "having the door opened for them." Pettibone also explained that the front door would be locked from the outside after hours, that security guards

---

[4](...continued)
bond pending appeal. Consistent with this opinion, that bond may be revoked.

8

are sometimes present at the front door, and that maintenance persons have keys to the locked doors.

On cross-examination, Pettibone conceded that, apart from her notes, she had no independent memory of seeing defendant on the day of the crime.  Although she remembered defendant, she did not remember seeing him on that specific day.  She also testified that patients had escaped from the psychiatric unit in the past.  Finally, Pettibone admitted that her notes did not account for defendant's whereabouts at 9:00 p.m. on the day of the crime.

Defendant next called Dr. Kalappurakal Joseph, a psychiatrist at the institute.  Joseph testified that he had only a vague memory of defendant and that, as a general matter, it would be very difficult for a patient to escape and return to the facility.  Defendant's last witness was his first appellate counsel, Ben Gonek.  Gonek testified that defendant passed a polygraph examination conducted by the Detroit Police Department after the trial.[5]  He also testified that defendant had consistently maintained his innocence. Defendant was unable to call his trial counsel to testify

---

[5] Defendant makes no claim of ineffective assistance on the basis of the polygraph examination.  Instead, he asserts without further explanation that it buttressed the credibility of Pettibone and Joseph.  The prosecutor has suggested that the polygraph test results may have been unreliable, given the state of defendant's mental health.

because she died before the hearing.

The trial court denied defendant's motion for new trial. First, the testimony at the *Ginther* hearing had been essentially cumulative of Yvonne Bond's medical records testimony at trial. Especially noteworthy was that, like Bond's trial testimony, nothing at the *Ginther* hearing verified defendant's whereabouts between approximately 6:00 p.m. and 10:30 p.m. on the day of the crime. Because of the cumulative nature of the testimony at the *Ginther* hearing, the trial court reasoned that defense counsel's performance had fallen "below that which would be expected of an attorney of ordinary training and skill in criminal law" only if she had presented "no testimony at all" regarding defendant's alibi.[6]

The trial court then noted that the victim's trial testimony had been especially compelling. In particular, it explained that the victim's memorable prior contacts with defendant "enhanced her credibility in making an accurate and reliable identification." The court also observed that the victim had a good opportunity to observe defendant accurately at the time of the crime, and that she immediately told the police that she had been raped by a man whom she knew. The

---

[6] In making this determination, the trial court relied on the standard set forth in *People v Garcia*, 398 Mich 250; 247 NW2d 547 (1976). That standard was rendered obsolete by *People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994).

10

trial judge then stated that he had been impressed by the victim's credibility while sitting as the trier of fact:

> Appellate counsel for [defendant], Mr. Gonek and Mr. Cripps, none of them have had occasion to look this complainant in the eye, judge her credibility, judge any motive to lie, judge to determine if she was making a mistake. I had that luxury and I remember her and she was a very believable witness. There's no doubt in her mind that this was the man who committed the rape.

For these reasons, the trial court concluded that defendant had not been denied the effective assistance of counsel. The trial court reached this conclusion without expressly stating whether it believed that defendant's case had been prejudiced by trial counsel's failure to call Pettibone and Joseph as witnesses.

The Court of Appeals then affirmed defendant's conviction in an unpublished per curiam opinion. In response to defendant's argument that he had been denied the effective assistance of counsel, the panel concluded that defendant failed to overcome the presumption that his counsel had been effective under the constitutional standard. The Court of Appeals reasoned that the *Ginther* hearing testimony did no more than the trial testimony to establish that defendant was locked in a mental institution on the night of the crime. Because both the trial testimony and *Ginther* hearing testimony tended to show that it would have been difficult, but not impossible, for defendant to escape and return without being

11

noticed, the Court of Appeals concluded that defendant failed to demonstrate that defense counsel's decision to call Bond, rather than Pettibone and Joseph, was anything more than trial strategy.  The panel also concluded that defendant failed to demonstrate the existence of a reasonable probability that, but for counsel's failure to present these witnesses, he would have been acquitted.

This Court initially denied defendant's application for leave to appeal.  461 Mich 946 (2000).  On reconsideration, we vacated the denial order and granted defendant's application for leave to appeal, limited to the question whether defendant was denied the effective assistance of counsel.  462 Mich 918 (2000).

## II.  EFFECTIVE ASSISTANCE OF COUNSEL

A defendant seeking a new trial on the ground that trial counsel was ineffective bears a heavy burden.  To justify reversal under either the federal or state constitutions,[7] a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v Washington*,

---

[7] US Const, Am VI provides that the accused in a criminal prosecution "shall enjoy the right . . . to have the Assistance of Counsel for his defence."  This requirement is made applicable to the states through the Fourteenth Amendment due process clause. *Gideon v Wainwright*, 372 US 335, 342; 83 S Ct 792; 9 L Ed 2d 799 (1963).  Likewise, Const 1963, art 1, § 20 provides that the accused in a criminal prosecution "shall have the right . . . to have the assistance of counsel for his . . . defense."

12

466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland, supra* at 687. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id.* at 690. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

In this case, defendant argues that he was denied the effective assistance of counsel because trial counsel (1) failed to interview Pettibone and Joseph before the trial, and (2) failed to call Pettibone and Joseph to testify at defendant's bench trial. Defendant characterizes defense

counsel's failure to call Pettibone and Joseph as a failure to present an alibi defense. We agree with the Court of Appeals conclusion that defendant's claim fails with respect to both parts of the *Strickland* test.

Initially, we reject defendant's argument that trial counsel's performance was deficient in failing to interview Pettibone and Joseph before trial. Nothing in the record establishes that trial counsel failed to investigate either Pettibone or Joseph before trial. Although trial counsel was deceased, and thus could not testify regarding the extent of her efforts to investigate defendant's alibi, neither Pettibone nor Joseph offered any helpful testimony regarding their contact or lack of contact with trial counsel in preparation for trial. Pettibone testified only that she could not remember whether she had contact with a lawyer; Joseph provided no testimony on the subject of defense counsel's pretrial preparation. The fact that defense counsel called Bond to testify at trial demonstrates that she had conducted a pretrial investigation regarding defendant's presence at the Detroit Psychiatric Institute on the day of the crime. Absent any evidence regarding the extent of trial counsel's pretrial investigation, especially with respect to the potential testimony of Pettibone and Joseph, we conclude that defendant failed to establish a necessary factual

14

predicate of this part of his ineffective assistance of counsel claim. See *Hoag*, *supra* at 6.

Defendant's ineffective assistance claim is thus reduced to an assertion that trial counsel's performance was deficient because she failed to call Pettibone and Joseph to testify at trial. As such, defendant cannot overcome the strong presumption that trial counsel's failure to call these witnesses was strategic. Contrary to defendant's argument, counsel's apparent decision not to present the testimony of the witnesses in question did not deprive defendant of an alibi defense. Bond testified at trial that medical records showed defendant to be present at the Detroit Psychiatric Institute at 5:55 p.m. and 10:30 p.m. and that he was "locked up" and "couldn't get out" between those times. Accordingly, defense counsel did present an alibi defense at trial.

The testimony at the *Ginther* hearing did nothing more than Bond's testimony to account specifically for defendant's presence between 5:55 p.m. and 10:30 p.m. on the day of the crime. If anything, this additional testimony only could have affected the quality of defendant's alibi defense. Viewed objectively, it is not at all clear that the quality of defendant's alibi defense would have been improved with the addition of testimony from Pettibone and Joseph. Joseph's generalized testimony was vague and conclusory. As such, it

would have added nothing of substance to defendant's alibi defense. Although Pettibone's testimony included more detail than Bond's testimony regarding (1) the precise number of locked doors that defendant would have had to have traversed and (2) the obstacles defendant would have faced attempting to *reenter* the facility, she also was not an expert on the security measures employed at the Detroit Psychiatric Institute. More importantly, Pettibone's posttrial testimony included two new and important pieces of information favorable to the prosecution that were not part of Bond's trial testimony. First, contrary to Bond's definite statement that defendant was "locked" in the facility between 5:55 p.m. and 10:30 p.m., Pettibone testified that the supposedly "locked" doors were actually unlocked during visiting hours from 6:30 p.m. to 8:00 p.m. on the day of the crime.[8] Second, Pettibone acknowledged that maintenance workers were present after hours with keys to the locked doors.

Although the failure to present cumulative testimony can amount to ineffective assistance of counsel under some circumstances, see *People v Johnson*, 451 Mich 115; 545 NW2d

---

[8] It seems likely that the shift in focus in the posttrial testimony from defendant's likelihood of escaping *from* the Detroit Psychiatric Institute to defendant's likelihood of reentering the facility was largely necessitated by Pettibone's damaging testimony suggesting the ease with which a patient could "escape" during visiting hours.

637 (1996), this is not such a case.  In *Johnson*, this Court held that the defendant's trial counsel was ineffective in failing to call additional defense witnesses to give favorable, cumulative testimony.  The defendant was convicted of second-degree murder for shooting a man during an affray in a Pontiac tavern.  The tavern owner and defendant's father testified that defendant did not shoot the victim.  A prosecution witness testified that defendant was the shooter.  Defendant presented evidence that his trial counsel was aware of at least four other witnesses who would have testified that defendant did not shoot a gun during the affray.  Defense counsel's testimony at the *Ginther* hearing did not suggest a strategic reason for his failure to call the cumulative witnesses.  Acknowledging that a trial is "not simply a balance scale," this Court nevertheless found the exculpatory evidence to be so substantial that it could have changed the outcome of the trial.  *Id*. at 122.  In contrast to the shooting at issue in *Johnson*, an alibi defense based on the extent of security measures taken at a mental hospital does not necessarily benefit from a number of different perspectives from different witnesses.

While there is no obvious reason why one person generally familiar with the subject would be less persuasive than three, the presentation of only one witness has the advantage of

17

eliminating the possibility of distracting inconsistencies. Here, for example, Pettibone's testimony regarding the precise times defendant was allegedly present in the facility (based on the medical records) differed somewhat from Bond's. Most notably, Bond gleaned from the records that defendant was present in the unit at 10:30 p.m., less than one hour after the police responded to the crime. Pettibone testified only that a bed check took place at 11:00 p.m. Given the problems with Pettibone's and Joseph's testimony, and the absence of any evidence that defense counsel's decision to present only Bond's testimony was not strategic, we conclude that defendant was not denied the effective assistance of counsel. His claim fails the "performance" part of the *Strickland* test.

For many of the same reasons, defendant's claim also fails the "prejudice" part of the *Strickland* test. On the basis of the trial court's findings of fact at trial, and its statements made in denying defendant's motion for new trial, it is clear that (1) the marginal differences in the alibi testimony of Pettibone and Joseph would not have had a significantly greater effect on the trier of fact than did the testimony of Bond, and (2) the trier of fact was especially impressed with victim's inherently credible trial testimony. Although the trial court did not expressly rule that the outcome at trial would have been the same had Pettibone and

18

Joseph been called to testify, it did state that their additional testimony was "for the most part, cumulative" and that the victim's testimony that defendant was one of her attackers was "very believable." Accordingly, on this record we cannot say that a reasonable probability exists that, but for counsel's failure to call Pettibone and Joseph to testify at trial, the result of the proceeding would have been different. Rather, we are confident that the result would have been precisely the same.

Affirmed.

CAVANAGH, WEAVER, KELLY, TAYLOR, YOUNG, and MARKMAN, JJ., concurred with CORRIGAN, C.J.