# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

SAMUEL STEEL III,

Defendant-Appellant.

UNPUBLISHED
February 26, 2015

No. 318561
Kalamazoo Circuit Court
LC No. 2011-001983-FC

Before: BECKERING, P.J., and BORRELLO and GLEICHER, JJ.

PER CURIAM.

A jury convicted defendant of first-degree premeditated murder, MCL 750.316(1)(a), felon in possession of a firearm, MCL 750.224f, and two counts of possession of a firearm during the commission of a felony (felony firearm), MCL 750.227b. The trial court sentenced defendant as a fourth habitual offender, MCL 769.12, to life imprisonment for the murder conviction, two to five years' imprisonment for the felon-in-possession conviction and two years' imprisonment for each felony firearm conviction. Defendant appeals as of right. For the reasons set forth in this opinion, we affirm.

## A. FACTS

Defendant's convictions arise from the shooting death of Milo Conklin on Easter Sunday April 24, 2011, at 626 Mabel Street in Kalamazoo. On that day, two groups of people gathered at 626 Mabel and at 629 Mabel respectively. The residences were located across the street from each other. Charles Thomas owned 626 Mabel and defendant's mother lived at 629 Mabel. On April 24, 2011, Conklin and his girlfriend, Alesha Caper, arrived at Thomas' house at approximately 4:00 p.m. Caper testified that when the two arrived and exited their vehicle, she saw defendant across the street. Caper testified that Conklin waved to defendant, but defendant did not wave back, instead began "mean mugging" the victim. Conklin testified that defendant and Conklin glared at each other and it was obvious to her that there was tension between the two men. Steven Brown, a friend of defendant, testified that defendant previously stated that he wanted to "get" Conklin. Walter Johnson, another friend of defendant, testified that defendant thought that Conklin broke into his home.

At approximately 6:00 or 7:00 p.m. that evening, Sherry Hatfield arrived at 629 Mabel to purchase heroin from defendant. Hatfield testified that defendant had to leave the residence with

-1-

Harry Mathews to get the drugs. Defendant returned and gave the drugs to Hatfield who then left the residence.

Sometime during the afternoon hours of April 24, 2011, defendant left the residence with Johnson and Mathews in Mathews' vehicle. The three men drove around the neighborhood for awhile, went to a liquor store, and returned to 629 Mabel. Johnson testified that at some point, defendant told him that he wanted to see his gun. According to Johnson, Mathews drove Johnson and defendant to the home of Johnson's cousin where Johnson retrieved a .40 caliber handgun from behind the home where it was hidden. Johnson testified that he gave the gun to defendant.

Michael Bork testified that someone stole a .40 caliber Heckler & Koch pistol from his residence on January 15, 2011. Paige Bowers and her boyfriend Mark Sprague testified that Bowers stole the gun from Bork's truck and then sold it to Johnson for cash and drugs. Shell casings from the crime scene matched casings retrieved from Bork.

After Johnson gave defendant the gun, he explained that he and Mathews dropped defendant off on Elizabeth Street at defendant's request. Johnson thought that defendant was going to "scare" Conklin. After dropping off defendant, Johnson said that he and Mathews drove to Woodbury Street where Mathews parked the vehicle. A couple of minutes later, both Johnson and Mathews heard gunshots. Mathews started driving down a road. Mathews testified that as he was driving he saw defendant running through a field. He pulled over to the side of the road and defendant got into the vehicle. Mathews testified that, when defendant entered the vehicle, defendant stated, "You didn't think I'd do it." Mathews testified that defendant instructed him to drive to his home on Douglas and as they were driving, defendant tossed the gun out the window.

Brown testified that he was at 626 Mabel with Conklin and other friends from noon into the evening on the day of the murder. As it became dark, Brown testified that he heard gunshots. Brown testified that he saw a man walking across the street from 626 Mabel through a shortcut. The man was wearing a black hooded sweatshirt and black sweatpants. Brown identified defendant as the shooter. Brown testified that defendant got into a white Suburban on Florence Street and he saw Mathews and another man inside the truck.

Mathews testified that after the shooting, he dropped defendant off at defendant's Douglas Street residence and waited in the driveway with Johnson. Mathews testified that defendant went inside the residence and changed his clothes. Defendant returned outside holding a bag with the clothes he had been wearing. Johnson and Mathews testified that the three men then drove to Johnson's residence nearby where defendant and Johnson burned the clothes that were in the bag, on the floor of Johnson's garage.

Mathews testified that on the day after the shooting, defendant asked him for a ride to Grand Rapids; Mathews agreed, when he started driving defendant stated he did not need to go to Grand Rapids, but just needed to get rid of the gun. Mathews testified that defendant had gone back and retrieved the gun. Defendant had the gun in pieces inside a bag. Mathews testified that defendant tossed the parts of the gun outside the window as Mathews drove.

In November 2011, Johnson, who was incarcerated on federal charges, informed Detective Brian Beauchamp of the Kalamazoo Department of Public Safety, that he had information about the Conklin murder. Police later discovered a charred area two-feet in diameter on the floor of Johnson's garage. Police recovered numerous charred bits from the garage including remnants of clothing.

Both Johnson and Mathews cooperated in the investigation and agreed to testify at defendant's trial as part of plea bargains. Based on information from Mathews, police recovered part of a rusted .40 caliber H&K pistol near a wooded area off of an exit on the highway.

Devon Smith testified that he was at 629 Mabel in November 2011, where he spoke with defendant. Smith testified that when defendant told him that police were "messing" with him about the Conklin murder, Smith asked defendant, "I thought you said you ain't do it, man?" According to Smith, defendant responded, "I had to, that mother------ broke in my house." Smith testified that defendant told him that Mathews and Johnson dropped him off on Elizabeth Street and told him that "I went through the shortcut on Elizabeth and I popped that mother------ and kept running through there." Smith testified that defendant told him he burned his clothes after the shooting.

After a warrant was issued for defendant's arrest, FBI agents tracked defendant to Atlanta, Georgia in the summer of 2012. Kristine Wilkerson testified that she met defendant in Atlanta in the spring of 2012. Defendant introduced himself as "Sammy Gunn," and Wilkerson began dating defendant and allowed him to move in with her. Wilkerson testified that one morning on her way to work, she was stopped by an FBI agent who showed her a wanted poster with defendant's photo on it. Wilkerson testified that she initially lied to the agent and denied knowing who the man was. According to the agent, Wilkerson became visibly upset when she was informed that the man in the poster was wanted for murder. During her testimony, Wilkerson testified that she felt very frightened after learning that defendant was wanted.

Agents eventually arrested defendant in Atlanta. At the time of his arrest, defendant had on his person "a white piece of paper with lines with a sketch of the streets involved in this investigation—Elizabeth, Mabel, Florence, Woodbury—showing a rough draft of a house—two houses and then an area labeled shortcut."

Detective Beauchamp testified that during the course of investigating the case, he discovered that defendant used various cellular telephone numbers that were registered under several names including "Nick Jake," "Timm Jones," and "Tim Jones."

At some point before trial, defendant and David Lee were inmates at the Newaygo County Jail. Lee testified that defendant talked to him about his case in Kalamazoo. According to Lee, defendant stated that "some guy had seen him, or whatever, jump out the car and shoot the dude up and whatnot like 20-some times with a Uzi-looking type gun or something." Lee testified that defendant told him that, after the shooting, "he basically ran and he went to Georgia." Defendant told Lee that he was upset that witnesses were going to testify against him and stated "he was just going to have to get in contact with his people that was locked up and . . . whatever, I guess get rid of them, I guess."

After the prosecution rested, defendant presented several witnesses including Tommy Morgan, Thomas, R.B. Davenport, and Antonio Williams. All four witnesses testified that defendant was not the person who shot Conklin. In addition, Lee Logan testified that in the summer of 2011, he was incarcerated in the Newaygo County Jail with Johnson and Smith. Logan testified that Johnson and Smith discussed this case and ways to obtain a reduction in their sentences. Logan stated that Johnson declared that he would tell the authorities whatever they wanted to hear to get a reduction in his sentence.

Defendant was convicted and sentenced as set forth above. After defendant filed his claim of appeal, this Court granted his motion to remand to allow him to move for a new trial on grounds of ineffective assistance of counsel and newly discovered evidence.[1]

On remand, the trial court held a two-day evidentiary hearing. At the hearing, Paul Pratt testified that on April 24, 2011, the day of the murder, he was using drugs at a house on Mabel Street. Pratt stated that he saw defendant that day and that evening, but denied telling appellate counsel that he saw the person who shot Conklin and that defendant was not that person.

Jacob Blett testified that in August 2013, he was incarcerated at the Newaygo County Jail with Johnson and Smith. Blett stated that Johnson implied that he himself had killed Conklin. Blett stated that Smith told him that detectives in Kalamazoo County wanted to make a case against defendant and were willing to believe information given to them without doing extensive investigation to verify the information. Blett stated that Detective Beauchamp allowed Johnson and Smith special privileges when they went to court appearances.

Lee testified that when he was in jail, he received a message that defendant wanted him to recant some previous statements. Lee refused to do so.

Johnson acknowledged that he spent time in jail with Blett, but denied speaking to Blett about his testimony at defendant's trial. Johnson also denied receiving any special privileges in jail. Smith also testified and agreed that he spent time in jail with Johnson, but could not recall speaking with Blett. Smith stated that he never told anyone that he lied at defendant's trial and denied that he received any special privileges in jail.

Roderick Ivey testified that he witnessed the Conklin shooting. Ivey stated that he went to the location because he intended to borrow money from defendant for the purpose of buying heroin. Ivey stated that he was standing next to defendant when the shooting occurred; Ivey identified Johnson as the shooter. Ivey denied telling Detective Beauchamp that defendant shot Conklin. Ivey stated that he was not contacted by defendant's trial attorney or private investigator.

Defendant's trial counsel testified that he was aware that Ivey told police that defendant did not shoot Conklin. Trial counsel stated that he and his private investigator concluded that

---

[1] *People v Steel*, unpublished order of the Court of Appeals, entered June 10, 2014 (Docket No. 318561).

Ivey's statement was inconsistent with those given by better witnesses. In addition, trial counsel stated that as he was preparing for trial, he was informed that Ivey had changed his statement and had identified defendant as the shooter. Trial counsel did not object to testimony regarding defendant's activities as a drug dealer because he believed that evidence would be revealed regardless of any objections. Trial counsel also stated that he believed that the evidence would be divulged by some defense witnesses.

Detective Beauchamp testified that Ivey's description of the route that the shooter took was inconsistent with statements given by other witnesses. Ivey initially stated that he did not know the shooter, but subsequently identified defendant as the shooter.

The trial court denied defendant's motion for a new trial. The court found that it was not reasonably probable that the result of the trial would have been different had defendant's trial counsel called Blett as a witness at trial. Regarding Ivey, the trial court found that Ivey had credibility issues and that the decision to not call him as a witness was a matter of sound trial strategy. The court concluded that given the circumstances, trial counsel did not render ineffective assistance.

## B. ANALYSIS

## I. CHANGE OF VENUE

Defendant argues that the trial court abused its discretion by denying his pretrial motion for a change of venue based on extensive and inflammatory pretrial publicity.

We review a trial court's decision on a motion to change venue for an abuse of discretion. *People v Jendrzejewski*, 455 Mich 495, 500; 566 NW2d 530 (1997). An abuse of discretion occurs when a trial court's decision falls outside the range of principled outcomes. *People v Yost*, 278 Mich App 341, 379; 749 NW2d 753 (2008).

As a general rule, a defendant should be tried in the county in which the offense was committed. *Jendrzejewski*, 455 Mich at 499; see also MCL 600.8312. A trial court may change venue in a criminal case "upon good cause shown by either party[.]" MCL 762.7. A change of venue can be appropriate if widespread media coverage of the crime and community interest result in actual prejudice against the defendant. *People v Unger*, 278 Mich App 210, 254; 749 NW2d 272 (2008).

Defendant asserts that his case received widespread and inflammatory media coverage such that a change of venue was warranted. He relies on eight news articles that were attached to his pretrial motion. The articles were dated from December 22, 2011, through October 29, 2012, and referred to defendant as "armed and dangerous," a "murder suspect," a felon charged in the instant case and another case involving dog fighting, a "most wanted man," "drug dealer," and a person with a violent past. Another article indicated that defendant was charged in the instant case. Defendant contends that this pretrial publicity was so extensive and so inflammatory that actual prejudice resulting from it should be presumed.

Defendant's argument is without merit. Pretrial publicity, standing alone, does not justify a change of venue. *Jendrzejewski*, 455 Mich at 502. The latest of the articles on which

defendant relied in his motion was published 10 months before defendant's trial began. The articles accurately cited the nature of the charges in this case and in another case involving dog fighting and were primarily factual in nature. The article from the website glhsreflection.org stated that defendant had killed before and had "gotten away with much more." However, these statements were made without attribution. A September 12, 2012, article from MLive summarized the evidence produced at the preliminary examination and stated that defendant had been ordered to stand trial in this case. That article was factual in nature and did not express an opinion about the case.

During voir dire, no potential juror indicated that he or she had formed an opinion about the case. Significantly, only one potential juror remembered hearing a news story about the case, but could not recall any details and had formed no opinion on the case. Defendant used a peremptory challenge to excuse this person. Defendant has not demonstrated that pretrial publicity generated actual prejudice against him such that he did not receive a fair trial with impartial jurors. See *People v Harvey*, 167 Mich App 734, 741-742; 423 NW2d 335 (1988). Accordingly, the trial court did not abuse its discretion in denying defendant's motion for a change of venue.

## II. ADMISSION OF EVIDENCE

Next, defendant contends that the trial court abused its discretion in allowing the prosecution to introduce evidence that he sold drugs under MRE 404(b) and in permitting Wilkerson to testify about how she felt when she learned that defendant was wanted by the FBI. Defendant preserved these issues for review by filing a pretrial motion to suppress the drug evidence and by raising contemporaneous objections to Wilkerson's testimony. *People v Dupree*, 486 Mich 693, 703; 788 NW2d 399 (2010).

A trial court's decision to admit evidence is reviewed for an abuse of discretion. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). An abuse of discretion occurs when a trial court's decision falls outside the range of principled outcomes. *Yost*, 278 Mich App at 379. "[A] preserved, nonconstitutional error is not a ground for reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999).

Before trial, the prosecution moved to admit other-acts evidence under MRE 404(b). The prosecutor explained the rationale for the evidence as follows:

> The People's theory of the case, is that the Defendant killed Milo Conklin . . . because he believed that [Conklin] stole- - broke into his house and stole drugs from him . . . and that was the very motive of him going to kill Milo Conklin . . . . And there are specific acts in people who knew both Milo and the Defendant, who can testify about the relationship and testify about prior acts of the Defendant in selling drugs in that community and why he wanted to kill the victim.

Defense counsel objected on grounds that evidence of drug sales in the community were not relevant to show motive in this particular case. Before trial at a motion hearing, the trial court

ruled that it would allow the prosecutor to introduce evidence that defendant's home was burglarized, that drugs were stolen, and that defendant believed that the victim was the perpetrator. The court reserved ruling on whether specific witnesses could testify to purchasing drugs from defendant and it limited the scope of testimony by ruling that the "whole slew of [undercover] purchases" was not admissible.

At trial, three witnesses testified regarding defendant's involvement with drugs. Bowers and Sprague testified that they stole a gun from their neighbor, Bork, and then sold the gun to Johnson in exchange for drugs and money. Bowers testified that she knew defendant had purchased heroin from him. Bowers obtained defendant's telephone number from Johnson so she could purchase heroin from him. She also testified that she did not talk to defendant about what happened on the night of the murder. Sprague testified that he obtained defendant's telephone number after his "dope man" Johnson was incarcerated on federal charges.

Hatfield testified that she went to a residence on Mabel Street on the day of the murder so that she could buy drugs from defendant. Hatfield testified that Mathews drove defendant somewhere to get the drugs. Defendant returned to the residence with drugs and he sold them to Hatfield, she then left the residence. She also testified that she had contact with defendant everyday for the past four years. On redirect, Hatfield testified that during the summer in 2011, she answered questions to authorities regarding defendant's "drug activity." During her testimony, a juror submitted a written question to the court asking what type of drugs defendant supplied to her. Hatfield responded to the question by stating that she purchased heroin from defendant.

In both the lower court and on appeal, the prosecution contends that the evidence concerning drug sales was relevant to show that defendant had motive to kill Conklin because defendant believed that he had stolen drugs from him. This argument lacks merit because the prosecution never established a link between prior drug sales and the burglary. Although there was evidence that Conklin broke into defendant's residence, the prosecution fails to cite any evidence introduced at trial to support that Conklin stole drugs during the burglary. Specifically, Brown testified that defendant wanted to "get" Conklin because Conklin broke into his house. Johnson testified that defendant suspected that Conklin broke into his house. This evidence supported that Conklin burglarized defendant's home and that defendant had motive to retaliate against him, but it was wholly unrelated to previous drug transactions involving Bowers, Sprague and Hatfield. The prosecution could have established motive through Johnson's and Brown's testimony that defendant believed Conklin broke into his residence. The prosecution never established a link between the prior drug sales and the burglary. Therefore, the evidence was not admissible under MRE 404(b) and the danger of unfair prejudice substantially outweighed any probative value the evidence may have had. MRE 403. Nevertheless, defendant cannot show that it is more probable than not that the erroneous admission of the other-acts evidence was outcome determinative. *Lukity*, 460 Mich at 496.

In this case, the prosecution did not discuss defendant's drug sales in any detail during opening statement or the closing and rebuttal arguments. Moreover, apart from the drug evidence, there was overwhelming evidence of defendant's guilt. Here, both Johnson and Mathews gave first-hand accounts of the events surrounding the murder, they implicated defendant in the crime and Smith testified that defendant admitted to the murder. Brown

-7-

testified that he was near 626 Mabel when the shooting occurred.  He explained that he saw Conklin fall to the ground.  He also testified that defendant was the shooter.  Brown testified that defendant wore dark sweatpants and a dark hooded jacket and he got into a white Suburban after the shooting, which corroborated Mathews' testimony that he picked up defendant after the shooting in his sport-utility vehicle.  Evidence supported that defendant had motive to commit the crime because he was upset that Conklin had broken into his residence.  See *Unger*, 278 Mich App at 223 ("evidence of motive in a prosecution for murder is always relevant").  In addition, police linked the gun to defendant.  Evidence showed that Bowers and Sprague sold Johnson a .40 caliber H&K pistol that they stole from Bork.  Johnson testified that he gave the gun to defendant on the night of the murder.  Police later recovered shell casings from the murder scene that matched old casings that Bork had at his home.  Police also recovered the gun in a location where Mathews said defendant tossed the gun.  Additionally, at the time of his arrest, defendant had in his possession a hand-drawing of the area where the shooting occurred.

Other evidence showed that, after the shooting, defendant took steps to conceal his involvement in the crime and fled the area.  Johnson and Mathews testified about defendant burning clothes in Johnson's garage and police later recovered charred remnants of clothing from Johnson's garage floor.  Mathews testified that defendant disassembled the gun and tried to conceal it by throwing it out of the vehicle.  Additionally, evidence showed that defendant left Michigan and went to Georgia after the shooting and that defendant changed his cellular telephone number on numerous occasions.  Defendant's attempts to conceal his involvement in the crime and evidence of flight supported an inference of consciousness of guilt.  *Id*. at 226-227.  Finally, the trial court provided a limiting instruction to the jury regarding the other-acts evidence and instructed the jury that it was not to consider the evidence as proof that defendant was of bad character and "jurors are presumed to follow their instructions."  *Id*. at 235.  In sum, there was overwhelming evidence of defendant's guilt and admission of the drug evidence did not impact the outcome of the proceedings.  *Lukity*, 460 Mich at 496.

Defendant also contends that the trial court erred in allowing Wilkerson to testify about how she felt after she learned that defendant was wanted by the FBI.  Specifically, Wilkerson testified that she was stopped by an FBI agent in Atlanta, the agent showed her a wanted poster with defendant's photograph on it.  Wilkerson explained that she was "freaking out" because she "didn't believe who these people were" and she thought she was going to be robbed.  When the prosecutor asked her "how did that make you feel when you found [out that the FBI was investigating defendant]," she responded, "Well, I wigged out.  I lost—."  Defense counsel objected, arguing "[h]ow she felt when the FBI was interviewing her, I believe, has no relevance . . . ."  The prosecutor argued that the response was relevant "as to flight, as to consciousness."  The trial court overruled the objection.  The prosecution then asked similar questions about how Wilkerson felt when she learned that the FBI was investigating defendant.  She testified that "I was confused, I was angry, I had a little breakdown, I was a little shocked," and stated that she had defendant living in her house with her kid such that "I sort of had a nervous breakdown."[2]

---

[2] Defendant also cites testimony from an FBI agent who testified during direct examination that, after learning that defendant was wanted for murder Wilkerson called him and was afraid to

Wilkerson's testimony concerning how she felt after she learned that defendant was wanted by the FBI was not relevant to any material issue regarding defendant's guilt or innocence of the charged offenses. The prosecution fails to articulate how the evidence was relevant to shed light on defendant's flight or consciousness of guilt. The trial court therefore abused its discretion in overruling defense counsel's objection. However, any error in the admission of this evidence was harmless. *Lukity*, 460 Mich at 496. Wilson's testimony did not reveal any personal knowledge about defendant's guilt or innocence of the charged offenses, and the prosecutor did not refer to Wilkerson's fear of defendant during closing argument. Moreover, the trial court instructed the jury that its verdict was to be based on the evidence, and not on prejudice or sympathy. A jury is presumed to follow its instructions. *Unger*, 278 Mich App at 235. Defendant has not shown that it is more probable than not that Wilkerson's testimony regarding her fear of defendant was outcome determinative. *Lukity*, 460 Mich at 496.

## III. PROSECUTORIAL MISCONDUCT

Defendant argues that the prosecutor engaged in misconduct by: (1) vouching for the credibility of prosecution witnesses and denigrating defense witnesses; (2) violating a stipulation regarding aliases used by defendant to purchase cell phones; and (3) failing to correct testimony given by Smith to the effect that Smith did not receive a reduction in his federal sentence in exchange for testifying at defendant's trial.

We review claims of prosecutorial misconduct on a case by case basis to determine whether defendant was denied a fair and impartial trial. *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001). "To determine if a prosecutor's comments were improper, we evaluate the prosecutor's remarks in context, in light of defense counsel's arguments and the relationship of these comments to the admitted evidence." *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009). Because defendant did not raise objections in the lower court, appellate relief is foreclosed unless defendant demonstrates a plain error that affected his substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Error requiring reversal will not be found if the prejudicial effect of the prosecutor's remarks could have been cured by a timely instruction. *People v Leshaj*, 249 Mich App 417, 419; 641 NW2d 872 (2002).

Defendant contends that the prosecutor improperly vouched for the truthfulness of its own witnesses during closing argument when the prosecutor argued as follows:

> [Johnson] had an agreement with the federal government. It's important to know what that agreement was. The agreement was to give truthful information regarding criminal activity that he was aware of. I'm going to repeat that: truthful information regarding criminal activity that he was aware of.

return to her home. However, the trial court sustained defense counsel's objection to the testimony and instructed the jury disregard the statement. Therefore, the trial court properly struck the testimony from the record and cured any potential prejudice. See *Unger*, 278 Mich App at 235 (jurors are presumed to follow their instructions).

The agreement wasn't to make up a story and to try to get some guy whatever you want. The agreement was not to come up with a lie. The agreement was that it had to be truthful. And so Walter Johnson came forward.

He has a minimum sentence of 20 years . . . . They did not agree to go below 20 years . . . . That was the agreement, to give truthful information on criminal activity.

\* \* \*

Well why did A.J. Mathews and Walter Johnson's testimony seem so similar? Because they were there. Because they're telling the truth. They didn't concoct this story. They came forward.

\* \* \*

What did Detective Beauchamp do? He just said, okay, I believe you. He could have. Certainly, when he came to testify, Devon Smith was very believable.

\* \* \*

Now I want to be very clear. There is no testimony on the record at all that Walter Johnson or Devon Smith ever got together and made up this story or, by the way, all the evidence; unfortunately for the defendant, it's just a coincidence. There's no indication of that whatsoever.

A prosecutor may not vouch for the credibility of a witness by stating or implying that he has special knowledge that the witness testified truthfully. *Seals*, 285 Mich App at 22. However, a prosecutor may argue from facts in evidence that a witness is or is not worthy of belief. *People v Dobek*, 274 Mich App 58, 67; 732 NW2d 546 (2007).

The prosecutor's comments concerning the credibility of its witnesses did not amount to misconduct. The prosecutor asserted that their testimony was consistent with other evidence in the record and contended that the testimony was credible for that reason. The prosecutor noted that Johnson and Mathews' testimony aligned and was therefore credible and he argued that Smith was believable because other evidence corroborated that he was in the neighborhood where he testified to have talked with defendant about the crime. These arguments did not insinuate that the prosecutor had special knowledge about the truthfulness of its witnesses. *Seals*, 285 Mich App at 22. Similarly, the prosecutor argued that Detective Beauchamp was credible because he did not merely take the witnesses at face value during the investigation. Rather, he went to great lengths to investigate the facts and circumstances and did not merely assume witnesses were credible. This did not insinuate that Detective Beauchamp or the prosecutor had some special knowledge about the witnesses' truthfulness and it was not otherwise improper. *Id.*

With respect to the prosecutor's reference to Johnson's plea bargain, "simple reference to a plea agreement containing a promise of truthfulness is in *itself* [not] grounds for reversal. A

more accurate statement of the law appears to be that, although such agreements should be admitted with great caution, admissibility of such an agreement is not necessarily error unless it is used by the prosecution to suggest that the government had some special knowledge, not known to the jury, that the witness was testifying truthfully." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). In this case, the prosecutor did not insinuate that he had special knowledge of Johnson's truthfulness. The jury was aware of Johnson's plea agreement. Specifically, during trial, Johnson testified that he entered into a plea agreement with the federal government wherein he agreed to offer truthful testimony at defendant's trial. Thus, the argument did not amount to misconduct that denied defendant a fair trial.

Defendant also argues that the prosecutor improperly denigrated the credibility of the defense witnesses. During closing argument, the prosecutor argued as follows:

> I asked [Thomas] about April 23rd and April 25th, he doesn't know. He's making it up. It's not – It's not a believable story.

> * * *

> How did he come forward? . . . He knows the defendant's family well . . . . Using your reason and common sense, it's not to be believed. David Lee warned us about this. David Lee was right.

> * * *

> So [defense witness Lee Logan] . . . In one sitting of testimony, he changed his story. A guy like that's not to be believable.

> * * *

> Devon Smith, A.J. Mathews, Walter Johnson, Steven Brown, David Lee, were they argumentative? Did they try to evade questions? No, they answered truthfully, or – I believe truthfully.

> * * *

> You can believe [Johnson, Mathews, Smith, Brown, and Lee] just completely made this up . . . You can believe that all of the officers that testified are just completely making this up; that Alesha Caper is making this up.

> * * *

> Once again you can choose to believe that all the testimony . . . the officers . . . who did an extremely thorough job whenever a witness came forward; Devin Smith, they are all making this up, and that, oh, just it's a coincidence that the corroborating evidence indicates its Sam Steel.

These comments did not improperly denigrate the defense. A prosecutor may argue from the facts that a witness is not worthy of belief. *Dobek*, 274 Mich App at 67. Here, the defense

witnesses testified that defendant did not commit the murder while the prosecution's witnesses testified that defendant did commit the murder. Therefore, the veracity of the witnesses was critical in this case and both sides were free to comment on the credibility of the witnesses. *Seals*, 285 Mich App at 22. The prosecutor's arguments amounted to comments on the credibility of witnesses and therefore did not amount to misconduct that denied defendant a fair trial. Moreover, the trial court instructed the jury that the attorneys' remarks were not evidence and the jury was to determine the credibility of the witnesses. The instruction served to alleviate any potential prejudice. See *Unger*, 278 Mich App at 237.

Defendant contends that the prosecutor committed misconduct when he violated the parties' stipulation "not to make reference to certain names as 'aliases' of [defendant]."

On the fourth day of trial, the prosecution sought to introduce People's Exhibit 99 to show that defendant used various telephone numbers after the murder. The parties agreed to redact the "a.k.a." referenced in the exhibit next to the names of the subscribers to the various telephone numbers. At trial, the prosecution presented police testimony that defendant used various telephone numbers issued to other individuals. During closing argument, the prosecutor argued as follows:

> This is Exhibit 99 that was admitted, and it indicates the phone-the phones that Sam Steel ad [sic]. And I'm not going to continue to go over all the testimony that Detective Beauchamp indicated, but he indicated why he knew that Nick Jake was registered under Nick Jake, why Sam Steel used that phone; why Tim Jones, when it was registered under Tim Jones, that Sam Steel used that phone. He indicated why he knew the name of Tim Jones and why it was registered under Tim Jones for Sam Steel. He indicated Sam Steel used all these phones under the name of Nick Jake, Tim Jones, and Tim Johnson.

The prosecutor did not commit misconduct by violating the parties' stipulation to refrain from characterizing names under which various cell phones used by defendant were registered as aliases used by defendant. During closing argument, the prosecutor referred to an exhibit that contained the names under which the phones were registered. The prosecutor mentioned the names, but did not state that defendant used the names as aliases. No clear error occurred.

Finally, in his Standard 4 brief, defendant contends that the prosecutor failed to correct Smith and allowed him to offer "false testimony" during direct examination. Defendant cites a line of questioning wherein the prosecutor asked Smith about his plea agreement and whether he received a reduction in his sentence. In response, Smith was evasive, and while he admitted that the minimum term of his federal sentence was below the guidelines, he attempted to maintain that his agreement to testify in this case was not the reason why his minimum term was reduced. He asserted that he was not aware of his plea agreement, but then acknowledged that his signature was on the document. The prosecutor's questions made clear that Smith was not being truthful about the agreement. Defendant cites no authority to support his assertion that the prosecution committed misconduct by failing to say or do anything further. No clear error occurred.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant raises several claims of ineffective assistance of counsel. The determination whether a defendant has been deprived of the effective assistance of counsel is a mixed question of fact and constitutional law. A court must first find the facts, and then decide whether those facts constitute a violation of the defendant's constitutional right to the effective assistance of counsel. *People v Dendel*, 481 Mich 114, 124; 748 NW2d 859 (2008), amended 481 Mich 1201 (2008). We review a trial court's findings of fact for clear error, but review its constitutional determinations de novo. *Id*.

To establish ineffective assistance of counsel, defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). Counsel must have made errors so serious that he was not performing as the "counsel" guaranteed by the federal and state constitutions. US Const, Am VI; Const 1963, art 1, § 20; *People v Carbin*, 463 Mich 590, 599; 623 NW2d 884 (2001). Counsel's deficient performance must have resulted in prejudice. *Carbin*, 463 Mich at 599-600. To demonstrate prejudice, defendant must show that there is a reasonable probability that but for counsel's error, the result of the proceeding would have been different. *Id*. at 600. Counsel is presumed to have afforded effective assistance, and the defendant bears the burden of proving otherwise. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999).

Defendant argues that counsel failed to prepare for trial.[3] Trial counsel testified that he substituted into the case after the preliminary examination and he sought and received two adjournments in order to prepare for the trial. Counsel testified that he immediately met with defendant at the Kalamazoo County Jail and met "many times" with defendant before the trial. Counsel requested and received a private investigator to work on the case. Counsel explained that he would meet with his staff and the private investigator at least once a week or more to discuss the case. Counsel also had an associate attorney help with the case. He explained that either the investigator or his associate interviewed all of the witnesses and he spoke with some of the witnesses on the telephone or before they took the witness stand. Counsel explained that he had his staff working on the case sometimes seven days a week and he would sometimes work seven days a week on the case. Counsel testified that he instructed his staff during the workup of the case. Counsel assigned tasks to his staff and the investigator and the investigator was tasked with tracking down witnesses. Counsel stated that he was fully prepared to go to trial by the time trial commenced. Given the complexities involved in the case and the substantial amount of witnesses and evidence involved, it was not unreasonable for counsel to assign numerous tasks to his staff and the investigator. Counsel and his staff performed a substantial amount of time preparing for trial and defendant does not indicate what counsel should have done differently that would have altered the outcome of the proceeding and he has failed to show that counsel was deficient in preparing for the case. *Carbin*, 463 Mich at 600.

---

[3] Defendant raises this issue in both his brief prepared by appellate counsel and in his Standard 4 brief.

Defendant argues that counsel was ineffective for failing to interview or call Ivey to testify at trial.[4] This argument lacks merit. Ivey testified at the evidentiary hearing that he told the police that Johnson shot Conklin. Ivey denied later telling Detective Beauchamp that defendant shot Conklin. Beauchamp, however, testified that Ivey initially told him that he did not know the shooter, but later identified defendant as the shooter. Counsel testified that he and his private investigator concluded that Ivey would not be a strong defense witness because he had changed his statement and because he had identified defendant as the shooter. Contrary to defendant's assertion, Ivey would not have served as an exculpatory witness. If Ivey had testified, the prosecution would have been able to impeach him with his statement to Detective Beauchamp that defendant was the shooter. Moreover, Ivey's description of the direction from which the shooter approached Conklin differed from that of other witnesses. Considering these weaknesses in Ivey's testimony, defense counsel's decision to not call him at trial amounted to reasonable trial strategy. *People v Rice*, 235 Mich App 429, 445; 597 NW2d 843 (1999).

Defendant appears to contend that counsel was ineffective for failing to interview Blett or call him to testify at trial. Counsel testified at the evidentiary hearing that he did not believe that he knew of Blett before trial and defendant fails to indicate how counsel could have discovered Blett's existence before trial. Therefore, defendant has not overcome the presumption that counsel rendered ineffective assistance with respect to Blett. *Rockey*, 237 Mich App at 76.

Next, defendant contends that counsel was ineffective for failing to object to testimony that he characterizes as inflammatory, including statements by witnesses that they were afraid of defendant. Defendant cites testimony of Brown wherein Brown testified that he felt "scared" of defendant and Detective Beauchamp testified that Brown was afraid of defendant. In addition, on cross-examination, defense counsel elicited testimony from Brown that Brown was scared because of "too many threats on my life." Similarly, Mathews testified that he was "scared." Finally, Lee testified that defendant threatened witnesses and their family. During his closing argument, the prosecutor argued that many witnesses were afraid to come forward to testify at trial. Defendant contends that counsel failed to object to the inflammatory testimony and otherwise rendered ineffective assistance with respect to the testimony.

With respect to Lee's testimony regarding defendant's attempt to intimidate witnesses, this evidence was relevant to prove consciousness of guilt. See *People v Sholl*, 453 Mich 730, 740; 556 NW2d 851 (1996) (a defendant's threats against witnesses are generally admissible to show consciousness of guilt). The other statements were not a focal point of the prosecution's case. In addition, the jury was instructed not to consider sympathy in its deliberations. Under these circumstances, it was reasonable for counsel to conclude that the trial court's instructions would be sufficient to cure any potential prejudice. In short, counsel did not act deficiently with respect to the statements. *Carbin*, 463 Mich at 600.

Defendant contends that counsel was ineffective with respect to his handling of the drug evidence. Before trial, counsel moved to suppress evidence of the drug sales and the trial court denied the motion. Thereafter, counsel attempted to use the drug evidence to defendant's benefit

---

[4] Defendant also raises this issue in his brief by appellate counsel and in his Standard 4 brief.

by advancing the theory that defendant left Michigan and went to Georgia because of the drug charges as opposed to fleeing the state because of the murder. To the extent that defendant argues that counsel should have also raised objections during the trial, as discussed above, admission of the drug evidence did not impact the outcome of the proceedings. Accordingly, defendant cannot show that, but for counsel's failure to raise contemporaneous objections, the result of the proceeding would have been different. *Id.*

Finally, defendant argues that counsel was ineffective for failing to raise objections during the prosecutor's closing argument. As discussed above, none of the challenged statements amounted to misconduct that denied defendant a fair trial. Therefore, defendant cannot show that counsel's failure to object impacted the outcome of the proceedings.[5] *Id.*

## V. NEWLY DISCOVERED EVIDENCE

Defendant argues that he is entitled to a new trial on the basis of newly discovered evidence, i.e., a new witness, Blett, whose testimony at the evidentiary hearing contradicted that given by Johnson and Smith to the effect that they did not speak with Blett in jail and did not tell Blett that he could receive a reduction in his sentence if he implicated defendant in the killing of Conklin. Defendant asserts that it is reasonably probable that the jury would have acquitted defendant if it had heard Blett's testimony.

"For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003). We review a trial court's decision on a motion for a new trial for an abuse of discretion. *People v Jones*, 236 Mich App 396, 404; 600 NW2d 652 (1999).

The trial court did not abuse its discretion by denying defendant's motion for a new trial on the basis of newly discovered evidence. Blett testified that Johnson and Smith indicated to him that they fabricated their trial testimony against defendant, and that they received special favors for doing so. Defendant contends that Blett's testimony constitutes newly discovered evidence because defendant did not encounter Blett or learn of Blett's conversations with Johnson and Smith until after his trial was concluded. In addition, defendant argues, Blett's testimony would impeach that given by Johnson and Smith (who denied any fabrication or receipt of special favors) and thus would not be cumulative, Blett's testimony could not have been produced before trial, and Blett's testimony would ensure a not-guilty verdict.

---

[5] In his initial brief on appeal, defendant argued that defense counsel rendered ineffective assistance of counsel by failing to call Pratt as a defense witness at trial. However, in a supplemental brief submitted after remand, defendant indicated that he withdrew the argument. Nonetheless, having reviewed the issue, we conclude that declining to call Pratt as a witness amounted to reasonable trial strategy. *Toma*, 462 Mich at 303.

Blett's testimony would constitute impeachment evidence against Johnson and Smith. Impeachment evidence can constitute grounds for a new trial if it meets the four-part test for newly discovered evidence set out in *Cress*. *People v Grissom*, 492 Mich 296, 299-300; 821 NW2d 50 (2012). Newly discovered impeachment evidence will justify a new trial if a "necessary exculpatory connection exists between the heart of the witness's testimony at trial and the new impeachment evidence" and "a different result is probable on retrial." *Id*. at 318.

Blett's testimony does not justify the grant of a new trial on the basis of newly discovered evidence. The evidence could not have been discovered before trial because Blett came forward after the trial was concluded. However, Blett's testimony regarding the credibility of Johnson and Smith was cumulative to other evidence introduced at trial on that subject. At trial, Johnson admitted on cross-examination that he did not mention Smith when he first spoke to authorities. Smith admitted that he did not come forward until months after the shooting. Defense witnesses Logan and Earnest Wynn testified that Johnson told them that he said what authorities wanted to hear regarding defendant in order to get his sentence reduced. In addition, the jury heard testimony regarding other credibility issues associated with witnesses Johnson and Smith, and still chose to find defendant guilty. Defendant has not shown a reasonable probability that the verdict would be different on retrial if a jury heard Blett's testimony. *Cress*, 468 Mich at 692; see also *Grissom*, 492 Mich at 318.

Affirmed.


/s/ Jane M. Beckering
/s/ Stephen L. Borrello
/s/ Elizabeth L. Gleicher