*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

LENARD ROSS,

Defendant-Appellant.

UNPUBLISHED
February 26, 2019

No. 338430
Wayne Circuit Court
LC No. 15-007735-01-FH

Before: GLEICHER, P.J., and K. F. KELLY and LETICA, JJ.

PER CURIAM.

Lenard Ross was convicted by a jury of felonious assault, MCL 750.82, and possession of a firearm during the commission of a felony ("felony-firearm"), MCL 750.227b. He was sentenced to concurrent terms of two years' probation for the felonious assault conviction and two years' imprisonment for the felony-firearm conviction. Ross appeals by right. Because we agree that Ross was denied the effective assistance of counsel, resulting in prejudice, we vacate his convictions and sentences and remand for a new trial.

## I. BACKGROUND

This case arises from an altercation between Ross and Terry Carter, who lived across the street from each other on Grandville Avenue. On the day in question, Carter returned home from work and walked across the street to talk to a neighbor. Ross was raking and sweeping leaves at the curb in front of his house. Carter testified that Ross suddenly started shouting at him, threatening to kill him. Ross then went in between his house and the driveway and returned with a handgun. Ross pointed the handgun at Carter's head and continued to scream that he was going to kill Carter. To get away from Ross, Carter walked across the street and went inside his home. According to Carter, Ross continued ranting and raving with the firearm in hand, so Carter came back outside to confront Ross. As Carter was walking toward Ross, the police arrived on the scene. Carter denied having a gun in his possession at any time throughout the incident.

The prosecution also presented testimony from three others who had witnessed parts of the events. Ross's next door neighbor, Clarice Hendley, testified that she was in her home when

she heard yelling outside. She heard someone say, "I'll kill you, I'll blow you away," and went to the door to see what was happening. Hendley saw Ross standing on his front porch waving a gun at Carter. Carter was in his own home, trying to get outside. Hendley called 911 to report the incident and then promptly left the area. She did not see Carter with a weapon.

Towanda Daniels, another Grandville Avenue resident, was walking to the store when she saw Ross running out of his backyard with a handgun. Carter was standing on his front porch. Daniels saw police cars and flagged them down to intervene. At trial, Daniels testified that she heard Ross claim that Carter pulled a rifle on him, but she did not see Carter holding a rifle. When the police asked her if she had seen Carter with a weapon, she said no.

A Detroit police officer who responded to Hendley's 911 call testified that, upon arrival at the scene, he saw Ross pointing a handgun across the street at Carter. The officer ordered Ross to drop the weapon several times before Ross complied. The officer handcuffed Ross and placed him in the police car before speaking with Carter. The police officer and his partner searched Carter and the area around Carter's home, but did not find any weapons. Carter denied consent to search his home, but the police officer did not see Carter enter his house after the police arrived.

At trial, Ross agreed that he was sweeping and raking leaves at the curb in front of his house, but testified that Carter and another neighbor began taunting and laughing at him. When Ross finally responded to the insults, Carter retrieved an assault rifle and tucked a handgun in his pants. Seeing Carter approaching him thus armed, Ross feared for his life and got a handgun from his vehicle. According to Ross, Carter retreated to his house, where Carter's daughter took the rifle. Carter then began to walk toward Ross again, at which point the police arrived. Ross conceded that Carter did not have the rifle anymore when he approached the final time but explained that, in 2014, Carter had shot at Ross's house with a gun he had hidden behind his back. Ross further explained that "[Carter] had two guns that day, a handgun and an AK." Ross repeatedly emphasized that he was in fear for his life and was acting in self-defense.

Ross filed a postconviction motion for a new trial, arguing that he was denied the effective assistance of counsel because his attorney failed to present a claim of self-defense, failed to present two witnesses who would have corroborated Ross's self-defense claim, and failed to impeach Daniels regarding a material fact. The trial court held a *Ginther*[1] hearing at which defense counsel testified regarding her decisions. The trial court also heard testimony from the two witnesses counsel declined to call at trial, defense counsel's investigator, and the assistant prosecutor who handled the case. Despite observing that some of defense counsel's testimony was "very troubling," the trial court determined that counsel's performance satisfied the constitutional guarantee of effective assistance of counsel and did not prejudice Ross.

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

## II. STANDARD OF REVIEW

A claim of ineffective assistance of counsel inolves a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews for clear error a trial court's findings of fact and de novo questions of constitutional law. *Id*. The trial court's decision to grant or deny a new trial is reviewed for an abuse of discretion. *People v Russell*, 297 Mich App 707, 715; 825 NW2d 623 (2012). "An abuse of discretion occurs when the trial court's decision is outside the range of principled outcomes." *Id*. (quotation marks and citation omitted).

## III. DISCUSSION

"Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Rodgers*, 248 Mich App 702, 714; 645 NW2d 294 (2001). To succeed on a claim of ineffective assistance of counsel, "a defendant must establish that 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The question of whether counsel performed reasonably is "an objective one and requires the reviewing court to 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *Vaughn*, 491 Mich at 670, quoting *Strickland*, 466 US at 690. "To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*., quoting *Strickland*, 466 US at 694 (quotation marks omitted).

Ross first argues that defense counsel was ineffective because of her failure to assert a self-defense theory at trial. "Trial counsel is responsible for preparing, investigating, and presenting all substantial defenses." *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009). "A substantial defense is one that might have made a difference in the outcome of the trial." *Id*. (quotation marks and citation omitted). Defense counsel decided against presenting a self-defense theory, instead opting to argue that the prosecution failed to establish felonious assault beyond a reasonable doubt. Although counsel briefly referred to the testimony concerning Carter's possession of a gun during the encounter and characterized Carter as "the terror of that neighborhood," the central point of her argument was that Carter's testimony about simply walking away after Ross pointed a gun at him was inconsistent with how a reasonable person displays fear. Ross challenges this decision only in the context of arguing that counsel should have pursued a self-defense theory, but we note that counsel's chosen defense is problematic even without balancing the decision against the an alternative option. "The elements of felonious assault are (1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999). Defense counsel's argument was inapt because the victim's alleged fear is not a mandatory element of criminal assault. *People v Davis*, 277 Mich App 676, 684-686; 747 NW2d 555 (2008), vacated in part on other grounds 482 Mich 978 (2008). Instead, the prosecution need only present evidence from which the jury could determine

beyond a reasonable doubt that the defendant engaged in behavior *designed* to place the victim in apprehension of an immediate battery. *Id*.

Turning to defense counsel's consideration of a self-defense theory, at the *Ginther* hearing defense counsel was asked, "[I]n your understanding of the law, if indeed the complainant had pulled a gun on Mr. Ross causing Mr. Ross to fear for his life, would he be entitled to wield a weapon in self-defense?" Defense counsel acknowledged that the proposed hypothetical would present an appropriate case of self-defense, but explained that the hypothetical was inapplicable in the instant matter based on comments Ross made during his video-recorded police statement. In particular, in recalling the events leading to his arrest, Ross told the police that he retrieved his handgun after Carter's daughter had taken Carter's assault rifle into the house. After emphasizing that Ross admitted he did not *see* a firearm thereafter, the following exchange occurred regarding Ross's assertion that he continued to fear for his life:

> *Q*. You made reference to this [a] moment ago, but do you recall hearing that it was a prior occasion when the complainant had shot at Mr. Ross' home?
>
> *A*. Yes.

> \* \* \*

> *Q*. And do you recall Mr. Ross telling you that he knew . . . that the complainant was known to carry a weapon in his backside like in his pants, that this is his [Ross's] experience with him [Carter]?
>
> *A*. No. I can't say I remember hearing that.
>
> *Q*. Okay. Do you recall when Mr. Ross indicated on the video that you made reference to that he continued to believe—even though the complainant had been disarmed, he continued to believe that the complainant had a weapon because of his prior experience with him?
>
> *A*. Okay. He thought that there was something in the back, and then when he was asked did you ever see a gun, he said no.

> \* \* \*

> *The Court*: Okay. What about—did he ever indicate as counsel asked you about pulling something from the backside?
>
> [*Defense Counsel*]: Right. When he [Carter] was walking up, he [Ross] thought he [Carter] was reaching in the back, and my hands are behind my back obviously reaching for something.
>
> *The Court*: Okay. And that's earlier in the statement?
>
> [*Defense Counsel*]: Yes.

-4-

*The Court*: Did the police ever expound on that?

[*Defense Counsel*]: Yes. They asked him, did you actually—did you see a gun? And he said no.

After reviewing Ross's recorded statement, the trial court found that "one could conclude, based upon that, standing alone, that there was a basis to argue self-defense." However, it also found that defense counsel's later discussions with Ross left her without "information . . . that would enable her to argue, successfully, that particular claim." We disagree with the latter finding. Although there was indeed evidence that defense counsel met with Ross on more than one occasion to discuss the case, defense counsel's explanation regarding the viability of Ross's self-defense claim was premised solely on his statement to the police. Even after Ross waived attorney-client privilege on the record, defense counsel did not indicate that Ross provided her with any information, beyond the recorded statement, that would defeat his claim of self-defense. Accordingly, we are left with a definite and firm conviction that the trial court erred by presuming that defense counsel's decision to forego a self-defense theory was properly influenced by her later discussions with Ross.

Furthermore, like the trial court, our review of Ross's recorded statement indicates that Ross's recollection of the altercation leading to his arrest would indeed support a claim of self-defense. "At common law, the affirmative defense of self-defense justifies otherwise punishable criminal conduct . . . 'if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself.' " *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010) (citation omitted). The defense "is founded upon necessity, real or apparent . . . ." *People v Riddle*, 467 Mich 116, 126; 649 NW2d 30 (2002) (quotation marks and citation omitted). Our Legislature has codified the common-law defense in the Self-Defense Act, MCL 780.971 *et seq*., which provides, in pertinent part:

(1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:

(a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

\* \* \*

(2) An individual who has not or is not engaged in the commission of a crime at the time he or she uses force other than deadly force may use force other than deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if he or she honestly and reasonably believes that the use of that force is necessary to defend himself or herself or another individual from the imminent unlawful use of force by another individual. [MCL 780.972(1) and (2).]

-5-

Defense counsel's explanation regarding her decision to forego a self-defense theory demonstrates a fundamental misunderstanding of self-defense law. Her reliance on the fact that Ross did not see a gun in Carter's possession after Carter's daughter took the assault rifle was misplaced in light of Ross's unequivocal indication that his earlier observations and past experiences with Carter led him to believe that Carter remained armed and continued to present a threat of imminent bodily harm. "In a self-defense claim, the accused's conduct is judged according to how the circumstances appeared to him at the time he acted." *People v Adamowicz*, 503 Mich 880 (2018), citing *Pond v People*, 8 Mich 150, 169 (1860). Ross's admission that he did not see a gun may have affected the strength of his self-defense claim, but it did not render the defense inapplicable. Indeed, if the jury believed that Ross only retrieved his own handgun because he believed it was necessary to defend himself from a similarly armed initial aggressor, the jury could have acquitted Ross of the charged offenses. MCL 780.972. See also M Crim JI 7.15 (instructing that honest and reasonable belief of danger permits a defendant to act in self-defense, even if the defendant is mistaken about extent of danger). While we recognize that an attorney's strategic determination of the most promising defense will generally not be deemed ineffective, *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995), we cannot characterize defense counsel's decision as a matter of objectively reasonable trial strategy when it was the product of a mistaken understanding of the controlling law. See *People v Trakhtenberg*, 493 Mich 38, 52-53; 826 NW2d 136 (2012) (stating that representation falls below objective standard of reasonableness when counsel fails to exercise reasonably professional judgment in deciding to forego investigation relevant to defense); *People v Grant*, 470 Mich 477, 486-487; 684 NW2d 686 (2004) ("Counsel must make 'an independent examination of the facts, circumstances, pleadings and *laws* involved . . . .' ") (citation omitted; emphasis added).

Whether defense counsel's deficient performance in this regard prejudiced Ross presents a closer question. Although defense counsel did not present Ross's self-defense claim in her closing argument, Ross's theory was nevertheless presented to the jury through his own trial testimony. And despite receiving appropriate instructions regarding self-defense from the trial court, the jury's guilty verdicts demonstrate that it rejected Ross's theory. Notwithstanding this fact, the record suggests that defense counsel's mistaken belief regarding the availability of a self-defense claim may have impacted her other strategic decisions to such a degree that the cumulative effect undermines our confidence in the outcome of the proceedings.

For instance, Ross also argues that defense counsel provided ineffective assistance when she failed to call two witnesses—Leonard Mattison and Ross's niece, Jacarra Jones—who would have corroborated Ross's version of events. "[D]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, which we will not second-guess with the benefit of hindsight." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004) (quotation marks and citation omitted). "Furthermore, the failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *Id*.

Mattison testified that he was riding his bike down Grandville Avenue when he saw Carter coming into the street with a rifle pointed at Ross. Mattison immediately turned around and rode the other way. Mattison anticipated testifying at trial, but defense counsel told him on the second day of trial that she would not call him as a witness because the prosecution would

"tear [him] apart." Defense counsel testified that she decided against calling Mattison after the prosecutor advised her that Mattison had been untruthful during a brief interview with the officer in charge. According to the assistant prosecutor, Mattison omitted reference to a conviction for receiving and concealing stolen property from 2006 when he described his criminal history, and the prosecutor advised defense counsel that he would impeach Mattison with the prior conviction and omission. Defense counsel testified that she confronted Mattison about the prosecutor's allegations and, in response, Mattison merely shrugged and did not otherwise respond.

Jones testified that she was living in Ross's household at the time of the altercation between Ross and Carter. Jones said that she was in the living room when she heard a confrontation between Ross and Carter outside. Jones walked to the window and saw Carter crossing the street toward Ross with a "long barrel gun." Stunned, Jones backed away from the window and did not witness anything else until she heard police sirens arrive at the scene. Jones testified that she wrote a statement concerning what she saw. Defense counsel acknowledged that Ross provided her with a number of letters from potential witnesses, including Jones. The handwritten statement, addressed to a detective who does not appear connected with this matter, states:

> Lenard Ross was having problems with Terry Carter July 7, 2014 late that evening. I was looking out our front living room window watching [Ross] having an altercation with Terry Carter. I then saw Terry Carter pulled out a gun a [sic] pointed it at [Ross] and shot. He then ran into his house.

An investigator retained by defense counsel testified that Ross told him Jones did not witness the subject incident. Defense counsel testified that she did not call Jones for that reason. The trial court found, and we agree, that Jones's testimony clearly concerned the earlier altercation between Ross and Carter in 2014, rather than the 2015 incident underlying Ross's conviction.

The prosecution's case against Ross turned on the credibility of Carter's version of events, as corroborated by three witnesses who were not present for the full altercation, compared with Ross's uncorroborated claim of self-defense. Had defense counsel understood the availability of a self-defense theory, it is probable that she would have appreciated the significant probative value of Mattison's testimony corroborating Ross's claim that, before he retrieved his handgun, Carter confronted him with an assault rifle. See, e.g., *People v Jones*, 48 Mich App 102, 107; 210 NW2d 145 (1973)[2] (recognizing importance of evidence corroborating a defendant's claim of self-defense). See also *People v Armstrong*, 490 Mich 281, 291; 806 NW2d 676 (2011) (reasoning that evidence pertaining to the charged offense generally carries more weight than impeachment through collateral matters). Instead, the jury was left to decide the case without the benefit of evidence vital to the credibility of Ross's self-defense testimony. Jones's testimony concerning the previous altercation between Ross and Carter would also carry

---

[2] Because *Jones*, 48 Mich App 102, was published before November 1, 1990, it is not precedentially binding on this Court. MCR 7.215(J)(1). We rely on *Jones* only as persuasive authority.

more significance in the context of a self-defense theory because it would support the reasonableness of Ross's fear.

Ross also argues that defense counsel was ineffective when she failed to impeach Daniels on a material issue. A police report concerning Ross's arrest noted that Daniels said she heard the two men arguing and saw Carter exit his home with a long gun, pointing it at Ross. Contrary to this report, Daniels testified under oath that she did not see Carter with a gun and that she said no when the police asked her if she had. Defense counsel did not impeach Daniels with this evidence or cross-examine her regarding another matter. Defense counsel testified, "I had no questions for [Daniels], because my strategy was that now it's about credibility, and Mr. Ross was gonna' testify to tell his side of the story." When pressed further about why her strategy would rely on Ross "clear[ing] it up," without impeaching Daniels, defense counsel went on to explain that she was aware that Ross had discussed buying alcohol for Daniels "for her to testify," and Daniels had become angry after they disagreed about the quantity of alcohol. Defense counsel did not want the dispute to come before the jury because "it's almost like you're bribing a witness to give your—in order for her to testify the way you want her to testify."[3]

Although decisions of whether to question witnesses are generally presumed to be matters of trial strategy, *Russell*, 297 Mich App at 716, like her decisions concerning Mattison and Jones, defense counsel's consideration of the benefits and potential harm of impeaching Daniels was tainted by her uninformed decision to forego a self-defense theory. Representation may be ineffective where "counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). Impeaching Daniels with the contradictory statement contained in the police report may have not only diminished the strength of the prosecution's case, but also bolstered the credibility of Ross's claim of self-defense.

## IV. CONCLUSION

Had defense counsel exercised reasonable professional judgment, she would have been aware that Ross's recorded statement supported his claim of self-defense and that a self-defense theory could be reasonably presented to the jury. To be clear, our opinion should not be read as implying that an attorney could not have made an objectively reasonable and strategic choice to refrain from calling Mattison and Jones or impeaching Daniels. Rather, the deficiencies in

---

[3] Although defense counsel considered the alcohol arrangement tantamount to bribery, we note that the statements attributed to Daniels in the police report were made to the responding police officers. In light of the failure to develop this issue at trial, it is unclear if the statements were accurately reported. At any rate, the fact that these statements were allegedly made before there was any discussion of Ross purchasing alcohol for Daniels undercuts the implication of "bribery." In addition, defense counsel's investigator was also aware of the arrangement and resulting disagreement between Ross and Daniels. When asked if there was any implication or suggestion that Ross was trying to procure false testimony, the investigator answered, "Not at all."

defense counsel's decisions arose from the fact that they were made without a complete understanding of the controlling legal principles. *Trakhtenberg*, 493 Mich at 52-53; *Grant*, 470 Mich at 486-487. Further, because of her misunderstanding of the law, it is unclear whether defense counsel would have proceeded in the same manner as it relates to Mattison, Jones, and Daniels. This uncertainty is significant enough to undermine our confidence in the outcome of the trial. *Carbin*, 463 Mich at 600. Accordingly, we vacate Ross's convictions and sentences and remand for a new trial. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Kirsten Frank Kelly
/s/ Anica Letica