*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

GARY LLOYD GEISTER,

        Defendant-Appellant.

UNPUBLISHED
December 21, 2023

No. 362131
Kalamazoo Circuit Court
LC No. 2020-001778-FC

Before: JANSEN, P.J., and CAVANAGH and GADOLA, JJ.

PER CURIAM.

Defendant, Gary Lloyd Geister, was convicted after a jury trial of two counts of first-degree criminal sexual conduct, MCL 750.520b(2)(b), and thereafter was convicted as a third-offense habitual offender. He was sentenced to 25 to 40 years in prison. Defendant appeals as of right. We affirm.

## I. FACTS

Defendant was convicted of sexually assaulting his step-granddaughter, KS. In December 2019, when KS was ten years old, she told her mother and stepfather, Danielle and Andrew Geister, that defendant had sexually abused her on several occasions while he was babysitting her, her younger sister, and her two younger brothers. Defendant is the father of Andrew Geister. According to Danielle, KS and her other daughter are her children from a previous relationship, while Andrew is the father of her two sons.

Danielle testified that defendant's relationship with all four of the children was that of a grandparent, and that defendant frequently offered to babysit the children. Danielle testified that when defendant babysat the younger boys (his biological grandchildren) at his home, he would regularly ask that KS also stay at his home to help him care for the boys. The babysitting usually occurred at defendant's home, where defendant installed a swing set and a trampoline[1] for the

---

[1] Defendant testified that the trampoline was purchased by Danielle and Andrew.

children. Defendant told Danielle and Andrew that when the children stayed overnight the girls shared a bedroom, the boys shared a separate bedroom, and defendant slept in a third bedroom. Danielle noticed, however, that as time went by KS spent more time in defendant's bedroom and that KS's belongings were in defendant's bedroom; defendant and KS explained to her that KS liked to use defendant's computer and liked to keep her belongings separate from her sister's belongings.

Danielle testified that she was concerned because defendant gave the girls more privileges than he gave the boys. Defendant also gave the children very generous gifts, and defendant's gifts to KS were more elaborate than the gifts to the other children. Danielle also was concerned because defendant would kiss the children on the lips, which Danielle thought was unsanitary for the children; Andrew spoke to defendant about the kissing. Danielle also testified that when she would pick the children up from defendant's house, she noticed that the three younger children often were outside playing, but defendant and KS were always in the house.

In December 2019, defendant agreed to babysit the four children at the family's home while Danielle and Andrew went Christmas shopping. When Danielle and Andrew returned home, KS was waiting up to see them. Danielle testified that KS seemed reluctant to go to bed, then began crying and told Andrew about defendant's past abuse. Danielle testified that KS at first was inconsolable, but once she was calmer KS also told Danielle about the abuse. The conversation lasted one to two hours; eventually, KS was able to go to sleep. After KS was asleep, at about 12:00 p.m. or 1:00 a.m., Danielle and Andrew called the police and reported what KS had told them.

Andrew testified that on the night in question, after KS informed him of the abuse he called defendant, but defendant did not answer the phone. The next morning, Andrew drove to defendant's house and confronted defendant with the accusations. Andrew testified that he was not specific about the abuse but suggested to defendant that the allegations were regarding sexual abuse. Andrew testified that defendant neither admitted nor denied the accusations, but did not ask for details about the accusations. Defendant was very apologetic and said he was sorry again and again.

KS, who was 12 years old at the time of trial, testified that defendant began abusing her when she was in fourth grade, or perhaps as early as third grade. She testified that the abuse occurred at defendant's house when she and her siblings would spend the night. KS testified that when they began spending the night at defendant's house she shared a bedroom with her sister, but later transitioned to defendant's bedroom at defendant's suggestion; during this time defendant would sleep on the couch in the living room. KS testified that at night, shortly after she would go to bed, defendant would enter the bedroom and lie on the bed. Defendant would remove all of her clothing or her night gown, and would touch her lips, face, and vagina with his hands, lips, and tongue, and would also touch her buttocks with his hands. She testified that she and defendant were alone in the bedroom at these times and that her siblings were asleep in the other bedrooms as far as she knew. She further testified that the abuse occurred "practically like every night" that she slept at defendant's house. KS also testified that defendant sometimes would tell her she was beautiful and tell her that he wished he could marry her. KS further testified that defendant often yelled at her siblings but not at her, that her siblings had an earlier bedtime than she did, that she

was allowed to use the electronic tablet more than her siblings did, and that when defendant gave them money to buy snacks, defendant always gave her more money than he gave her siblings.

KS corroborated her parents' testimony that on a night in December 2019, she told her parents that defendant had been sexually abusing her. She testified that she had wanted to tell someone earlier, but had been afraid to do so. In response to questions on cross-examination, KS testified that she did not remember quarreling with defendant or with her mother over her use of the iPad, nor did she remember being in trouble at school during the fifth grade.

MS, the sister of KS, was ten-years-old at the time of trial. MS testified that when she and her siblings stayed the night at defendant's house, she and KS sometimes slept in the same room, but sometimes KS slept in defendant's room; MS also testified that sometimes defendant slept on the couch and sometimes he slept in his bedroom, but MS was not sure if defendant and KS slept in defendant's bedroom at the same time. MS testified that when defendant gave the children money to buy snacks, he gave KS more money than he gave the other siblings.

Detective Jeff Jerzyk with the Kalamazoo Township Police Department testified that he interviewed defendant on January 20, 2020. Defendant denied the allegations of sexual abuse and told Jerzyk that he was "flabbergasted" that KS would invent the allegations. Detective Jerzyk testified that defendant told him that he babysat for KS and her siblings on December 17, 2019, so that Danielle and Andrew could finish their Christmas shopping. Defendant told Jerzyk that he and KS had a disagreement that night. Defendant explained that he had been planning to give the children electronic tablets for Christmas and in preparation, he advised KS about the proper use of a tablet; defendant reported that KS had gotten into trouble earlier for improper use of a tablet. Jerzyk testified that defendant reported that KS did not like the advice and became annoyed, and defendant told KS not to be rude. Regarding the sleeping arrangements for the children at defendant's home, Jerzyk testified that defendant stated that he moved KS from the girls' bedroom to his bedroom because the girls sometimes quarreled. Defendant also confirmed to Jerzyk that he usually sent the younger children to bed first, and KS would go to bed last. During the interview, defendant told Jerzyk that KS was mature and that she was "10 going on 40."

The prosecution called Thomas Cottrell as an expert witness. Cottrell testified that he was the Chief Programming Officer for the YWCA West Central Michigan, overseeing programming to address domestic violence, sexual assault, and child sexual abuse. The trial court qualified Cottrell as an expert in the field of child sexual abuse dynamics and offender characteristics. Cottrell testified that a perpetrator of child sexual abuse often "grooms" a child victim by engaging in behavior that is intended to reduce the likelihood that the victim will resist the sexual abuse or report the abuse. Grooming may include threats, making the child feel responsible or guilty, flattery, making the child feel obligated by giving the child gifts, giving the child special privileges, and making the child victim feel special.

Cottrell also testified that it is not unusual for a child victim to delay reporting sexual abuse for months or years, often because they are traumatized or did not appreciate that the conduct was inappropriate. Cottrell testified that most delays in reporting sexual abuse arise from the child doing a kind of cost/benefit analysis, weighing whether the consequences of telling are worse than the consequences of remaining silent. As a child grows older, the child experiences the abuse differently and may conclude that reporting the abuse is preferable. Cottrell also testified that it is

not unusual that a child victim would not be able to recount the day the abuse began or the number of times the abuse occurred.

Defense counsel's theory at trial was that KS was lying about the abuse because she was angry with defendant for lecturing her about the use of an electronic tablet. During cross-examination of Cottrell, defense counsel asked the following questions, and Cottrell responded as follows:

*Q.* In your experience, have you ever had cases where the sexual abuse was not founded or the child had in some way, you know, either lied about what happened or made it up in an effort to gain something from that?

*A.* I have a small fraction of cases, yes, where that has indeed happened.

*Q.* And what are the circumstances there that you've observed?

*A.* I've had children fabricate abuse when a sibling was abused and they thought that sibling was getting some special attention by coming to therapy and playing with the toys that were in my office and so the other child would allege sexual abuse so they could come and play too and it was pretty clear that that abuse didn't happen.

I've had children who, [an] older child in the case I'm thinking of, disclose sexual abuse when actually what was going on in the household was domestic violence but the mother would not get herself safe so the child fabricated sexual abuse allegation so that the authorities would come in and the other dynamic in the household could be revealed that really it was [] domestic violence abuse.

I've had children, teen males who . . . alleged abuse when they were actually the perpetrators of abuse but fancied themselves or believed that they were victims and [] the more we got into the case, we realized that they were actually the assailant against a parent.

I've had a few cases of Munchausen's by proxy where a parent through some very deliberate coaching and essentially brain-washing convinced the child to disclose about the other parent and the child did so without any affect that would normally be connected to sexual abuse but disclosed abuse and this was very much focused on the parent getting attention for the child's disclosure which is what Munchausen's by proxy is [,] essentially create an ill child so the parent gets attention and in this case, it was creat[e] an ill child through allegations of sexual abuse.

Defendant testified at trial, denying the allegations of sexual abuse. He testified that when the children stayed at his house, he gave KS his bedroom because she and MS quarreled when they shared a bedroom, but that he always slept on the couch in the living room. Defendant testified that KS was "like 10 going on 40. She's just very, very smart and more mature for her age than most kids her age." When asked whether that was good or bad, defendant explained "[i]t's a good

thing and it's a bad thing because she can be sweet, kind, considerate, pushy, manipulative and wants to get her own way sometimes but primarily, she's a good girl." Defendant further testified that he gave the children privileges according to their ages, so KS as the oldest child received greater privileges.

Defendant testified that on the night of December 17, 2019, he babysat the children at their home. That evening, he gave KS advice about proper use of the tablet he planned to give her for Christmas; when she became annoyed by his advice, he told her that she was being rude. Defendant testified that after he returned home on December 17, 2019, Andrew called him and they talked for three minutes about the alleged abuse, which defendant testified he denied. He testified that the next morning, Andrew came to his home and again told him about the allegations. Defendant agreed that he said he was sorry, but that he meant he was sorry about the allegations and about Andrew having to come to his house early in the morning. When asked if KS had a motive to make false accusations, defendant testified that KS was being pressured by her mother to talk to her biological father about his drinking, and that KS may have made the allegations to avoid the conversation with her biological father. Defendant also testified that KS in the past had lied to her parents and had lied at school. Defendant testified that the previous time he babysat the children, Andrew had told him that KS did not want to go to defendant's house.

At the conclusion of the evidence and arguments, the trial court instructed the jury. Regarding Cottrell's testimony, the trial court stated:

> You have heard Thomas Cottrell's opinion about the behavior of sexually abused children. You should consider that evidence only for the very limited purpose of deciding whether [KS's] acts and words after the alleged crime were consistent with those of sexually abused children. That evidence cannot be used to show that a crime charged here was committed or that the defendant committed it, nor can it be considered an opinion by Thomas Cottrell that [KS] is telling the truth.

The jury convicted defendant of two counts of first-degree criminal sexual conduct. Defendant now appeals.

## II. DISCUSSION

Defendant contends that he was denied the effective assistance of counsel at trial because defense counsel elicited damaging testimony from the prosecution's expert witness on cross-examination that would not have been admissible on direct examination. We disagree that defense counsel was ineffective.

To preserve a claim of ineffective assistance of counsel, a defendant must move in the trial court for a new trial or an evidentiary hearing, *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012), or timely move for remand in this Court. *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). In this case, the parties agree that defendant's allegation of error is unpreserved. This Court reviews an unpreserved assertion of error for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Substantial rights are affected when the lower court proceedings were affected by the error. *People v Burger*, 331 Mich App 504, 516; 953 NW2d 424 (2020). "Reversal is warranted only when plain

-5-

error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id*. (quotation marks and citation omitted). This Court reviews an unpreserved assertion of ineffective assistance of counsel for errors apparent on the record. *People v Hoang*, 328 Mich App 45, 63; 935 NW2d 396 (2019).

A defendant is constitutionally entitled to the effective assistance of counsel. *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021). The effective assistance of counsel is presumed, and the defendant's burden to prove otherwise is a heavy one. *Id*. To establish that counsel was ineffective, the defendant must prove that (1) counsel's performance fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defendant, meaning that there is a reasonable probability that the outcome would have been different but for the deficient performance. *People v Jurewicz*, 506 Mich 914, 195 (2020), citing *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) (quotation marks and citation omitted).

A claim of ineffective assistance of counsel focuses on "deficiencies in the defense counsel's decision-making." *People v Randolph*, 502 Mich 1, 14; 917 NW2d 249 (2018). Decisions about trial strategy are within the broad discretion of trial counsel. *People v Pickens*, 446 Mich 298, 325; 521 NW2d 797 (1994). A court is required to determine whether defense counsel's strategic decision was made after an incomplete investigation. *Trakhtenberg*, 493 Mich at 52. If defense counsel's strategy is reasonable, then his or her performance is not deficient. *Randolph*, 502 Mich at 12. A deficiency prejudices the defendant when there is a reasonable probability that but for counsel's error, the verdict would have been different. *Id*. at 9.

In this case, defendant contends that he was denied effective assistance of counsel because defense counsel elicited damaging testimony from the prosecution's expert witness on cross-examination. In cases of alleged sexual abuse, "(1) an expert may not testify that the sexual abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty." *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857 (1995). An expert may testify, however, "regarding typical symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an abuse victim or to rebut an attack on the victim's credibility." *Id*. at 373.

"[E]xpert witnesses may not testify that children overwhelmingly do not lie when reporting sexual abuse because such testimony improperly vouches for the complainant's veracity." *People v Thorpe*, 504 Mich 230, 235; 934 NW2d 693 (2019). *Thorpe* involved two consolidated cases; in one of the consolidated cases, *Thorpe*, the prosecution presented Thomas Cottrell as an expert witness who was permitted by the trial court to testify as an expert in the area of child sexual abuse and disclosure. On cross-examination, defense counsel asked the witness whether children can lie or manipulate, and the witness agreed that they could. *Id*. at 239. The prosecution on redirect asked the expert witness "what, in your experience, if you can say, is the percentage of children who actually do lie [about the sexual assault itself]." *Id*. Over objection by defense counsel, the witness responded that "…probably two to four percent of the cases that we get hav[e] children alleging . . . sexual abuse when abuse did not actually occur." *Id*. at 240. Cottrell then discussed

two scenarios in which children are likely to lie about sexual abuse, neither of which was a scenario present in that case. *Id.*

The defendant in that case was convicted, and this Court affirmed his convictions. Our Supreme Court reversed and remanded to the trial court for a new trial. *Id.* at 266. The Court stated:

> We conclude that [the defendant] has shown that it is more probable than not that a different outcome would have resulted without [the expert's] testimony that children lie about sexual abuse 2% to 4% of the time. In [*People v*] *Peterson* [, 450 Mich 349; 537 NW2d 857 (1995)], this Court observed that nearly identical testimony allowed "the experts in that case [to] improperly vouch [] for the veracity of the child victim." Here, not only did [the witness] opine that only 2% to 4% of children lie about sexual abuse, but he also identified only two specific scenarios in his experience when children might lie, neither of which applies in this case. As a result, although he did not actually say it, one might reasonably conclude on the basis of [the expert's] testimony that there was a 0% chance [the child] had lied about sexual abuse. In so doing, [the expert] for all intents and purposes vouched for [the child's] credibility. [*Thorpe*, 504 Mich at 259 (footnotes omitted).]

The Court also explained:

> [The defendant's] trial was a true credibility contest. There was no physical evidence, there were no witnesses to the alleged assaults, and there were no inculpatory statements. The prosecution's case consisted of [the child's] allegations, testimony by her mother regarding [the child's] disclosure of the alleged abuse and behavior throughout the summer and fall of 2012, and [the witness'] expert testimony. [The defendant] testified in his own defense and denied the allegations. Additionally, [the defendant's mother] testified about other reasons for [the child's] behavior during the summer and fall of 2012; namely, that her mother had started a new relationship and become pregnant and that [the defendant] had decided to no longer have parenting time with [the child]. Because the trial turned on the jury's assessment of [the child's] credibility, the improperly admitted testimony wherein [the expert witness] vouched for [the child's] credibility likely affected the jury's ultimate decision. Under these circumstances, we conclude that [the defendant] has shown that it is more probable than not that a different outcome would have resulted without [the expert's] improper testimony. [*Id.* at 260.]

In this case, the prosecution called Cottrell, who testified about the dynamics of child sexual abuse and offender characteristics. On direct examination, Cottrell did *not* testify about the probability that a child witness would lie about sexual abuse. During cross-examination, however, defense counsel asked Cottrell the following questions, and Cottrell responded as follows:

> *Q.*      In your experience, have you ever had cases where the sexual abuse was not founded or the child had in some way, you know, either lied about what happened or made it up in an effort to gain something from that?

*A.* I have a small fraction of cases, yes, where that has indeed happened.

*Q.* And what are the circumstances there that you've observed?

*A.* I've had children fabricate abuse when a sibling was abused and they thought that sibling was getting some special attention by coming to therapy and playing with the toys that were in my office and so the other child would allege sexual abuse so they could come and play too and it was pretty clear that that abuse didn't happen.

I've had children who, [an] older child in the case I'm thinking or, disclose sexual abuse when actually what was going on in the household was domestic violence but the mother would not get herself safe so the child fabricated sexual abuse allegation so that the authorities would come in and the other dynamic in the household could be revealed that really it was [] domestic violence abuse.

I've had children, teen males who are alleging abuse, alleged abuse when they were actually the perpetrators of abuse but fancied themselves or believed that they were victims and [] the more we got into the case, we realized that they were actually the assailant against a parent.

I've had a few cases of Munchausen's by proxy where a parent through some very deliberate coaching and essentially brain-washing convinced the child to disclose about the other parent and the child did so without any affect that would normally be connected to sexual abuse but disclosed abuse and this was very much focused on the parent getting attention for the child's disclosure which is what Munchausen's by proxy is [,] essentially create an ill child so the parent gets attention and in this case, it was creat[e] an ill child through allegations of sexual abuse.

Defendant argues that defense counsel's performance fell below an objective standard of reasonableness; our Supreme Court's decision in *Thorpe* was issued in July 2019, Cottrell was the prosecution's expert in *Thorpe*, and the testimony elicited here was similar to the evidence our Supreme Court found detrimental in *Thorpe*. Although there was a strategic reason to ask the first question about whether children ever lie about sexual abuse, there was no apparent strategic reason to ask the open-ended question about the circumstances under which that might occur. Defendant argues that defense counsel should have been aware of *Thorpe*, and thereby should have been aware of the answer Cottrell, the expert in *Thorpe*, was likely to give.

We observe, however, that Cottrell's testimony in this case differs from his testimony in *Thorpe*. Cottrell did not testify in the specific way that was found prejudicial in *Thorpe*; he did not suggest that children lie about sexual abuse so rarely and in such specific circumstances that there is effectively zero chance that a child is lying. Cottrell in this case testified that "I have a small fraction of cases, yes, where that has indeed happened" that children lied about sexual abuse. Counsel thus obtained a response from Cottrell that children do sometimes lie and, in fact, had lied in some of his cases, which supported the defense theory at trial that KS lied. That defense counsel also obtained a less favorable answer to his follow-up question was perhaps a result of bad strategy,

bad cross-examination skills, or a simple mistake, but does not rise to the level of objectively unreasonable.

Moreover, the record in this case does not support a finding that defense counsel's performance, even if deficient, prejudiced defendant because there is not a reasonable probability that the outcome would have been different but for defense counsel eliciting this testimony from Cottrell. The record provides ample evidence to support defendant's conviction. KS, who was 12 years old at the time of trial, was clear and unequivocal in her testimony. She testified that defendant began sexually abusing her when she was in third or fourth grade, and that the abuse occurred "practically like every night" that she slept at defendant's house. KS testified that when they began spending the night at defendant's house she shared a bedroom with her sister, but later moved to defendant's bedroom at his suggestion. KS's sister, MS, confirmed the sleeping arrangements at defendant's house. KS explained that defendant would send the other children to bed in other rooms, and she would be allowed to stay up later. Then, shortly after she would go to bed in defendant's bedroom, defendant would enter the room and sexually assault her while the other children were asleep in other rooms. KS described the abuse in detail.

Defendant's conduct, as described by KS and her mother, fits the description of "grooming" as explained by Cottrell on direct examination. KS testified that defendant would tell her she was beautiful and that he wished he could marry her, and often yelled at her siblings but not at her. She was allowed to use the electronic tablet more than her siblings, and when defendant gave them money to buy snacks, defendant always gave her more money than he gave her siblings. MS confirmed KS's testimony that when defendant gave the children money to buy snacks, he gave KS more money than he gave the other children.

KS's mother, Danielle, testified that when defendant babysat the younger boys at his home, he would regularly ask that KS also stay at his home to help. The babysitting usually occurred at defendant's home, where defendant installed a swing set and a trampoline for the children. Danielle also testified that when she would pick the children up from defendant's house, she noticed that the three younger children were often outside playing, but defendant and KS were always in the house. Danielle testified that she was concerned because defendant gave the girls more privileges than he gave the boys, and gave gifts to KS that were more elaborate than the gifts to the other children.

Further supporting KS's accusations is defendant's response when Andrew Geister confronted him. Andrew testified that when he confronted defendant with the accusations, he was very general that the accusations involved sexual abuse, but did not describe the alleged abuse. Defendant neither admitted nor denied the accusations, was very apologetic, saying he was sorry again and again, but did not ask for details about the accusations.

At trial, defendant denied the allegations and suggested that KS had a history of lying. He confirmed, however, KS's testimony that he directed her to sleep in his bedroom, and confirmed that he gave KS greater privileges. Defendant suggested that KS was lying out of anger because she was annoyed that he attempted to give her advice about proper use of the tablet he was planning to give her as a Christmas gift. Defendant also testified, however, that KS was "like 10 going on 40," which is the same phrase he used to describe KS to Detective Jerzyk. Defendant further said about KS that "She's just very, very smart and more mature for her age than most kids her age."

Defendant's description of KS suggests that he viewed KS as an adult, not a child. When asked at trial whether KS's maturity was good or bad, defendant explained "[i]t's a good thing and it's a bad thing because she can be sweet, kind, considerate, pushy, manipulative and wants to get her own way sometimes but primarily, she's a good girl," suggesting that defendant was frustrated that KS was growing less compliant as she grew older and was less persuadable with the gift of a tablet.

At the conclusion of the evidence and arguments, the trial court instructed the jury. Regarding Cottrell's testimony, the trial court stated:

> You have heard Thomas Cottrell's opinion about the behavior of sexually abused children. You should consider that evidence only for the very limited purpose of deciding whether [KS's] acts and words after the alleged crime were consistent with those of sexually abused children. That evidence cannot be used to show that a crime charged here was committed or that the defendant committed it, nor can it be considered an opinion by Thomas Cottrell that [KS] is telling the truth.

"Jurors are presumed to follow their instructions, and jury instructions are presumed to cure most errors." *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020) (quotation marks and citation omitted).

As discussed, to establish that counsel was ineffective, the defendant must prove that (1) counsel's performance fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defendant, meaning that there is a reasonable probability that the outcome would have been different but for the deficient performance. *Jurewicz*, 506 Mich at 195. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Carbin*, 463 Mich at 600. We conclude that the record demonstrates ample support for the jury's conviction of defendant and there is not a reasonable probability that the outcome would have been different but for the deficient performance. Defendant therefore failed to establish that he was denied the effective assistance of counsel, and similarly failed to establish plain error.

Affirmed.

/s/ Kathleen Jansen
/s/ Mark J. Cavanagh
/s/ Michael F. Gadola

-10-