*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* COUNTRYMAN/MORGAN/SMITH, Minors.

UNPUBLISHED
May 21, 2025
2:59 PM

No. 371548
Wayne Circuit Court
Family Division
LC No. 2020-000316-NA

Before: WALLACE, P.J., and RICK and GARRETT, JJ.

PER CURIAM.

Respondent-mother[1] appeals as of right an order terminating her parental rights to the minor children under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm if the child is returned to the parent). We affirm.

## I. FACTUAL BACKGROUND

Mother has three children: JDC, DDM, and KDS. In January 2020, Children's Protective Services (CPS) received a complaint relating to an injury suffered by KMB, who is mother's 12-year-old sister. At that time, mother was KMB's guardian. The record indicates that KMB was hospitalized for a severe burn. KMB is developmentally delayed. A CPS worker investigated. At some point in February 2020, KMB reported that she burned herself after mother refused to "give her cereal. . . ."

On March 3, 2020, the CPS worker made an unannounced visit to the house where mother and the children were living, precipitated by mother's refusal to return the worker's telephone calls. JDC, DDM, and the children's 96-year-old grandmother, Freddie Smith, who also lived in the home, were present. The CPS worker determined that mother had left Smith to care for JDC and DDM, who were two and three years old at the time, respectively. KMB was at school. Mother

---

[1] The children's fathers are not parties to this appeal.

-1-

and six-month-old KDS were not in the house. Smith suffers from dementia and has mobility issues.

The CPS worker observed that JDC and DDM were in "completely soiled clothing" and diapers. The home "was very dirty [and] messy[,]" smelled of urine, and was littered with holes in the walls and ceiling. Freddie told Barnes that she fell at 10:00 a.m. that morning and could not get up. Because KMB was at school, no one was in the house to assist Freddie or help care for the children. Freddie reported that she had not eaten anything that day. When asked if DDM and JDC had eaten, Freddie stated that "they fed themselves." Given the children's young ages, the CPS worker did not believe this was possible. The CPS worker spoke to mother over the telephone and asked her to return home. In response to this, mother threatened the worker, who then called the police.

Mother eventually arrived at the home with KDS. She admitted to the CPS worker that she had not been home since Sunday, March 1, 2020. Mother gave inconsistent statements about her and KDS's whereabouts during that time. The CPS worker attempted to locate a relative to care for the children and KMB, but was unsuccessful. The children were ultimately taken into custody by law enforcement. Law enforcement also contacted adult protective services on Smith's behalf.

That same day, petitioner, the Department of Health and Human Services (DHHS), filed a petition for the children's removal, alleging that mother's housing was unsuitable for children and that she failed to properly care for and supervise the children.[2] DHHS requested that the trial court authorize the petition, place the children in DHHS's care, and exercise jurisdiction. The court entered an ex parte order removing the children from mother's care and placing them with DHHS. The children were thereafter placed in a nonrelative foster home. They remained in foster care for the duration of the proceedings. The petition was later amended. After a preliminary hearing, the trial court authorized the amended petition. Mother was granted parenting time.

In June 2020, following a bench trial, the court exercised jurisdiction. The court ordered reasonable efforts toward reunification be made. After the initial dispositional hearing, mother was ordered to comply with and benefit from a case service plan (CSP). The CSP required mother to (1) complete a psychological evaluation; (2) participate in infant mental health (IMH) services; (3) obtain and maintain suitable housing and a legal income; (4) remain in contact with caseworkers; and (5) attend parenting time. The court also ordered mother to submit to a psychological evaluation to better determine her needs. Mother did so, and was later referred to virtual individual therapy, online parenting classes, and parent-partner services. Mother's progress was limited, and she often failed to attend parenting time.

In January 2022, DHHS filed a supplemental petition for termination of mother's parental rights. In relevant part, the petition alleged that the children were taken into care because of unsuitable housing and improper supervision. The petition further alleged that mother failed to make progress on her CSP and failed to resolve her issues with housing and parenting skills. The

_____

[2] A petition was also filed concerning KMB, who was placed in Children's Village, a residential care facility. Mother's guardianship over KMB later "lapsed" and terminated.

petition indicated that mother lacked legal income. It stated that termination was in the children's best interests.

At the June 2022 termination hearing, a caseworker testified about mother's lack of sufficient progress. The worker noted that mother had completed a parenting class, a psychological evaluation, and participated in individual therapy, but failed to complete the IMH services, despite being referred five times. The caseworker was unsure whether mother's housing was suitable for children, stating that mother was currently living in a home with an unidentified "friend" and that the home had yet to be assessed. As for income, mother told the caseworker that a health condition rendered her unable to work. Mother further informed the caseworker that she applied for disability benefits and was awaiting the decision.

Over the course of the proceedings, mother participated in 124 parenting time sessions, 73 of which were virtual. She failed to attend 109 sessions. DHHS provided mother with transportation, but mother failed to meet the transportation worker outside the home on 15 occasions. Mother was required to confirm her parenting time appointments by 10:30 a.m., and again by 2:00 p.m., on the day of the parenting time, but sometimes failed to do so, resulting in parenting time being canceled. The caseworker indicated that, prior to offering direct transportation, DHHS also provided mother with gas cards and bus tickets in an effort to help with her transportation issues. Mother reported that she was unable to ride the bus because of "her physical problems." The caseworker indicated that mother had an unidentified issue with her kidneys, but testified that she did not know why mother's health issues prevented her from riding the bus. She was likewise unsure of whether mother's health issues would inhibit her ability to parent.

The caseworker testified that mother was not bonded with the children and opined that termination was in their best interests. The caseworker explained that the children had been in the same foster care placement for most of the prior two years and that the foster parents were willing to adopt them. The caseworker also testified that she observed mother and the children during a parenting time. She agreed that the children "engaged" with mother, but noted that JDC and KDS often tried to run out of the room.

The referee declined to terminate mother's parental rights, noting that mother participated in individual therapy and completed a parenting class, indicating that she had made some progress toward reunification. The referee expressed concern that mother had not been provided adequate assistance relating to housing. The referee further stated that he wanted to know "exactly what is wrong health-wise, what are the conditions or whatever, what are the ailments, but there was no documentation presented by either side as to what these issues were." He indicated that mother would only be granted "a short period of time to prove that she's going to try to get her act together." The referee noted that mother required assistance with getting disability benefits, attending parenting time, and "reestablishing a bond with the kids . . . ." Mother was instructed to be ready to leave when the DHHS transporter arrived at her home for parenting time. Following the hearing, the trial court entered an order denying DHHS's petition to terminate mother's parental rights.

In January 2023, DHHS filed a second supplemental petition for termination of mother's parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). In relevant part, DHHS alleged

that the children were taken into care because of unsuitable housing and improper supervision. DHHS alleged that mother failed to make progress on her CSP and failed to resolve her issues with housing and parenting skills. It was further alleged that mother lacked legal income and that termination was in the children's best interests.

After a series of scheduling issues, the termination hearing was held on March 26, 2024, and May 1, 2024. Mother did not appear on either date. The referee heard extensive testimony from the children's foster care caseworker. The caseworker testified that mother was sporadically employed and failed to provide documentation showing proof of employment. DHHS offered her assistance with finding employment through Michigan Works, but mother never found a steady job. Her housing situation was equally concerning. According to the caseworker, mother had moved back to the home in Detroit from which the children were originally removed. The caseworker stated that the home was assessed in March 2024 and was found unsuitable for children. Specifically, the house was "still deplorable." It had "safety risks" because of exposed wires. The foundation of the home was rotting. The house also did not have beds for the children. The caseworker testified that mother was given housing resources, but mother failed to meet with a caseworker for help filling out housing applications, despite being given the opportunity.

Mother additionally failed to consistently participate in therapy or parenting time. She was first terminated from individual therapy in May 2022, and was re-referred for individual therapy seven times after that. Mother was last referred in March 2024, and was not participating in therapy at the time of the termination hearing. Mother was additionally referred for IMH services in August 2020 but failed to comply with those services. She was terminated from the program in June 2021. Mother was re-referred to IMH services five more times during the proceedings, but was always terminated from the service because she failed to comply with certain requirements. With respect to parenting time, mother was offered two in-person parenting time sessions each week. Throughout the case, mother was offered 366 parenting time sessions. Mother failed to attend 184 sessions. Mother was never able to exercise unsupervised parenting time during the pendency of the proceedings.

The caseworker testified that mother had not demonstrated an ability to parent the children and keep them safe. He described parenting time sessions as chaotic, with the children constantly acting out. Mother attempted to redirect the children, who did not take these attempts seriously. Mother additionally (1) failed to have activities planned for parenting time; (2) rarely brought things, such as food and toys, to parenting time; (3) did not read to the children; and (4) did not do "anything of meaning" with the children. She also failed to comfort the children when they cried, and rarely showed them affection. When mother was "present," she failed to "demonstrate any basic parenting skills." The caseworker indicated that mother had completed a parenting class, but had not benefited from it.

The caseworker did not believe the children were bonded with mother. The children would act out when they had to attend parenting time, including crying and asking for their foster parents. The children referred to the foster mother as "mommy," and the foster residence as "home." They referred to mother, in part, by her legal first name. Mother tried to correct the children and inform them they only had one mother. According to the caseworker, this was "confusing for kids their age."

The caseworker acknowledged that mother had issues with transportation. However, he testified that she was provided with bus tickets and gas cards during the proceedings. Mother was also offered transportation through Uber. At times during the proceedings, caseworkers from DHHS transported mother to and from parenting time. However, she was often unresponsive when issues would come up with regard to parenting time.

The caseworker additionally testified that all three children had significant health issues that would require treatment. Despite knowing about these issues and being invited to participate in the children's care, mother never got involved and did not attend medical appointments. The foster parents appeared willing and able to care for the children, while mother did not. The caseworker did not believe that mother would demonstrate improvement within a reasonable time. He believed the children would be at risk of harm if returned to her care.

Following the close of testimony, the referee found that reasonable efforts toward reunification had been made, but that statutory grounds for termination existed under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). The referee further concluded that termination of mother's parental rights was in the children's best interests. The trial court thereafter entered an order terminating mother's parental rights. This appeal followed.

## II. ANALYSIS

## A. REASONABLE EFFORTS

Mother first argues that she was entitled to enhanced protections under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*., and that DHHS failed to accommodate her. As a result, she argues that DHHS failed to make reasonable efforts to facilitate reunification. We disagree.

"We review for clear error the trial court's factual finding that [DHHS] made reasonable efforts to reunify [a] respondent[] with the child." *In re Atchley*, 341 Mich App 332, 338; 990 NW2d 685 (2022). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) (quotation marks and citation omitted).

Generally, DHHS "has a statutory duty to make reasonable efforts to reunify the child and the family. . . ." *In re Atchley*, 341 Mich App at 338 (quotation marks and citation omitted), citing MCL 712A.19a(2). There is likewise "a commensurate responsibility on the part of respondents to participate in the services that are offered," and to benefit from them. *Id*. at 339 (quotation marks and citation omitted). "If a parent cannot or will not meet her irreducible minimum parental responsibilities, the needs of the child must prevail over the needs of the parent." *In re Terry*, 240 Mich App 14, 28; 610 NW2d 563 (2000) (quotation marks and citation omitted).

"Title II of the ADA requires that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' " *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017), quoting 42 USC 12132. If a parent suffers from a disability under the ADA, DHHS must "modify its standard procedures in ways that

are reasonably necessary to accommodate a disability under the ADA." *Id*. "[E]fforts at reunification cannot be reasonable . . . if the [DHHS] has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *Id*. However, DHHS cannot be required to provide reasonable accommodations for a disability of which it is unaware. *Id*. at 87.

In this case, mother argues that she was not provided with appropriate services to address barriers to reunification, even though DHHS was aware she had issues with her kidneys. Mother alleges that her health issues impeded her ability to participate in services, locate housing, and secure employment. However, mother never provided DHHS with medical documentation of (1) her alleged disability; (2) the limitations caused by the alleged disability; or (3) accommodations she required. DHHS was made aware, at different points during the proceedings, that mother had kidney issues requiring her to take medication. Mother also implied that she was fatigued, had limited mobility, and could not ride the bus because of her kidney issues. However, aside from mother's vague assertions, there is no record evidence to support the claim that she suffered from a cognizable disability under the ADA requiring accommodations and "services designed to facilitate the child[ren's] return to [mother's] home. . . ." See *In re Hicks/Brown*, 500 Mich at 86.

While mother failed to provide DHHS medical documentation confirming an alleged disability, DHHS nonetheless took steps to accommodate mother as best it could. Mother was offered virtual parenting time, virtual parenting classes, and virtual individual therapy. Mother was terminated from individual therapy for failure to comply, and she was re-referred to the service several times. Despite DHHS's continued attempts to get mother engaged in therapy, mother either did not comply or show a benefit from therapy. And while mother completed virtual parenting classes, she failed to benefit from them, as evidenced by a lack of demonstrable parenting skills during parenting time. Mother was also repeatedly referred to IMH services and to a parent-partner service during the proceedings, to no avail.

Beyond that, mother was offered bus passes and gas cards to assist her with transportation to services and to parenting time. DHHS mailed the bus passes to mother on at least two occasions. When the bus passes and gas cards proved to be unhelpful, DHHS offered mother direct transportation to and from parenting time. Mother was required to confirm her attendance at parenting time prior to a transporter being dispatched. When the transporter arrived at mother's home at the agreed-upon time, the transporter then alerted her. If mother did not get in the vehicle within 15 minutes, the transporter left and parenting time was canceled. While mother repeatedly complained that she was not provided adequate notice of the transporter's arrival, mother's parenting time schedule did not vary. Mother was instructed to watch for the transporter, beginning at 3:10 p.m., either from a window or the front porch, to ensure she was picked up in a timely fashion. Nonetheless, mother often missed her pickup and failed to attend a significant amount of parenting time. Additionally, caseworkers offered to transport mother to certain locations to assist her with applying for employment and housing, but mother did not avail herself of these offers.

Mother also implies on appeal that she suffers from a cognitive limitation or issues communicating in a socially acceptable manner. But apart from a comment by a referee at the June 2022 termination hearing, there is no indication that mother was cognitively impaired or had significant mental health concerns. Additionally, the record demonstrates that DHHS provided

services that comported with the recommendations in mother's psychological evaluation, which demonstrates that DHHS was responsive to mother's needs.

Mother merely provides conclusory statements about the services she was provided and how they were inappropriate given her alleged disabilities. This is insufficient to establish error. See *In re Sanborn*, 337 Mich App 252, 267; 976 NW2d 44 (2021) (stating that it is not enough for a parent to simply deny "that the services offered were sufficient in light of her intellectual disability, without identifying any services that would have been appropriate in light of such disability or how the services that were offered were deficient"). Despite the efforts made by DHHS to accommodate her, mother still failed to benefit from the services offered during the four-year proceedings. In short, mother failed to uphold her "commensurate responsibility" to engage in and benefit from the services offered by DHHS. See *In re Atchley*, 341 Mich App at 339. Contrary to mother's arguments on appeal, there is no indication that she would have fared better if DHHS had offered other services or accommodations to assist her. See *In re Fried*, 266 Mich App 535, 543; 702 NW2d 192 (2005). The trial court did not clearly err by finding that DHHS made reasonable efforts toward reunification, and that mother was provided with adequate services and accommodations to aid in reunification.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Mother next argues her trial counsel was ineffective by failing to request ADA accommodations and by failing to ensure that DHHS made reasonable efforts toward reunification. We disagree.

Mother did not take steps to preserve her ineffective assistance of counsel claim, and instead raises the issue for the first time on appeal. See *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012); *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).[3] The argument is unpreserved, and our review is limited to mistakes apparent on the record. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). Claims of ineffective assistance of counsel are mixed questions of fact and law. *In re Casto*, 344 Mich App 590, 610; 2 NW3d 102 (2022). This Court "review[s] for clear error a trial court's factual findings, and questions of constitutional law are reviewed de novo." *Id*.

"Both the Michigan and federal Constitutions guarantee the right to the assistance of counsel in criminal cases. Given the nature of accusations and consequences in child-protective proceedings, this right has been extended to these civil proceedings." *Id*. at 611 (citations omitted). Therefore, a parent has a right to a lawyer in child protective proceedings, including the right to appointed counsel. *In re Williams*, 286 Mich App 253, 275-276, 779 NW2d 286 (2009);

---

[3] "In the context of child protective proceedings . . ., this Court has determined that constitutional due process indirectly guarantees a right to the effective assistance of counsel." *In re Londowski*, 340 Mich App 495, 506; 986 NW2d 659 (2022). "The principles applicable to claims of ineffective assistance of counsel in the arena of criminal law also apply by analogy in child protective proceedings. . . ." *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016).

MCR 3.915(B)(1). The right to counsel guarantees effective assistance of counsel. See *In re HRC*, 286 Mich App 444, 458; 781 NW2d 105 (2009).

> To be constitutionally effective, counsel's performance must meet an objective standard of reasonableness. . . . To obtain relief for the denial of the effective assistance of counsel, the [respondent] must show that counsel's performance fell short of this objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the [respondent's] trial would have been different. The effective assistance of counsel is presumed, and a party claiming ineffective assistance bears a heavy burden of proving otherwise. [*In re Casto*, 344 Mich App at 611-612 (alterations in original; quotation marks and citations omitted).]

Mother argues that her trial counsel was ineffective for failing to ensure that she was afforded protections under the ADA and failing to ensure that DHHS made reasonable efforts to reunify her with the children. However, as already discussed, mother never provided DHHS with medical documentation explaining her disability or the accommodations necessary to address it. Because there is no indication that mother provided this information to her trial counsel either, mother has failed to establish the factual predicate for her claim of ineffective assistance of counsel. See *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) ("the defendant necessarily bears the burden of establishing the factual predicate for his [or her] claim" of ineffective assistance of counsel).

Additionally, the existing record does not support mother's argument on appeal. Even though DHHS was never given medical documentation of mother's alleged disability, mother's trial counsel repeatedly challenged the services that mother was provided. Counsel also questioned witnesses about mother's kidney issues and transportation issues during review hearings, permanency planning hearings, and the 2022 termination hearings. It is clear that trial counsel made a concerted effort to ensure that DHHS took steps to accommodate mother. Mother offers no substantive argument demonstrating that the services were deficient, or how different services would have been reasonable and appropriate in light of her alleged disability. Without an identification of services, we are left to speculate as to what other services and accommodations DHHS could have offered. We likewise fail to see what additional services or accommodations could have been requested by trial counsel. In short, mother cannot establish that her trial counsel's performance was deficient, and she is not entitled to relief.

## C. STATUTORY GROUNDS

Mother additionally argues the trial court clearly erred by finding statutory grounds for termination of her parental rights. We disagree.

"We review for clear error the trial court's finding that there are statutory grounds for termination of a respondent's parental rights." *In re Atchley*, 341 Mich App at 343. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App at 80 (quotation marks and citation omitted).

"To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Pederson*, 331 Mich App 445, 472; 951 NW2d 704 (2020) (quotation marks and citation omitted). The clear and convincing evidence standard is "the most demanding standard applied in civil cases[.]" *Id.* (alteration in original; quotation marks and citation omitted).

We conclude that termination was proper under MCL 712A.19b(3)(j), which permits termination when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent." Exhibiting behavior that would put a child at a risk of harm justifies terminating parental rights under MCL 712A.19b(3)(j). *In re White*, 303 Mich App 701, 712-713; 846 NW2d 61 (2014). The harm contemplated under (j) includes emotional harm and physical harm. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011). "[A] parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." See *In re White*, 303 Mich App at 711.

The children were removed from mother's care because of unsuitable housing conditions and her failure to ensure that the children received proper care and supervision. Mother was referred to a myriad of services throughout the lengthy proceedings to address the barriers to reunification. She either failed to participate or failed to benefit. Mother was never granted unsupervised parenting time during the four-year proceedings. Mother repeatedly failed to attend parenting time despite being provided transportation. She did not know how to care for the children's medical needs because she failed to attend their appointments. There were consistent concerns about mother's ability to care for the children and keep them safe if they were to be returned to her custody.

At the time of termination, mother continued to lack suitable housing. She reported that she planned to live in the home from which the children were removed. However, the home was not habitable and did not pass a housing assessment. Unsuitable housing could undoubtedly cause harm to the children. Mother additionally failed to put the children's needs first, as evidenced by her failure to consistently attend parenting time, failure to participate in the children's medical treatments, and failure to appear at the 2024 termination hearings. Children require consistency, stability, and a knowledgeable caretaker to continue thriving. Mother could not, or would not, provide these things. Because there is a reasonable likelihood that the children would experience harm if returned to mother, the trial court's finding that termination of mother's parental rights was proper under MCL 712A.19b(3)(j) was not clearly erroneous.[4]

---

[4] Because termination was proper under (j), we need not address the additional grounds relied upon by the trial court to terminate mother's parental rights. See *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009) (noting that DHHS need only establish one statutory ground for termination).

## D. BEST INTERESTS

Finally, mother argues that termination of her parental rights was not in the children's best interests. We disagree.

We review a trial court's best-interest determination for clear error. *In re White*, 303 Mich App at 713. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App at 80 (quotation marks and citation omitted).

"The trial court must order the parent's rights terminated if the Department has established a statutory ground for termination by clear and convincing evidence and it finds from a preponderance of the evidence on the whole record that termination is in the children's best interests." *In re White*, 303 Mich App at 713. "The trial court should weigh all the evidence available to determine the children's best interests." *Id*. This Court focuses on the child—not the parent—when reviewing best interests. *In re Atchley*, 341 Mich App at 346. In making its determination,

> the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App at 713-714 (quotation marks and citations omitted).]

The trial court "has a duty to decide the best interests of each child individually." *In re Olive/Metts Minors*, 297 Mich App 35, 42; 823 NW2d 144 (2012). "[I]f the best interests of the individual children significantly differ, the trial court should address those differences when making its determination of the children's best interests." *In re White*, 303 Mich App at 715.

To the extent that mother and the children were bonded, the bond was not healthy for the children. The children entered protective care in 2020 because of neglect and unsuitable housing. DDM, who is mother's oldest child, had significant health and learning issues that needed to be addressed immediately. The other children also had health issues. Over the four-year period in which mother had the opportunity to work toward developing a bond with the children, mother declined to be involved in their health treatment. She likewise failed to benefit from her CSP, including a parenting class that was designed to assist her with interacting with the children. Additionally, mother frequently failed to attend parenting time despite being provided with transportation. When mother attended parenting time, she often failed to appropriately engage with the children or discipline them. The children, who did not want to attend parenting time, exhibited poor behavior toward each other and toward mother. The children often asked for the foster parents and exhibited dysregulated behavior after parenting time ended for the day. Testimony at the 2024 termination hearing indicated that discontinuing parenting time would provide the children with much needed stability. In sum, mother's bond with the children, if one

existed, was not healthy for them.  See *In re Pederson*, 331 Mich App at 477 ("[T]he parent-child bond is a blade that is capable of cutting both ways; whether it benefits or harms a child depends on how the parent wields it").

However, the parent-child bond is only one factor for the trial court to consider.  *In re Olive/Metts*, 297 Mich App at 41-42.  As already discussed at length, mother failed to participate in, and benefit from, the CSP.  Mother was either unable, or unwilling, to effectively parent despite completing parenting classes and being offered other services.  The children required permanency and stability, and were reportedly thriving in foster care.  The children had a healthy bond with the foster parents, who were devoted to their well-being and wanted to adopt them.  Conversely, it is unclear how mother, who did not seek to understand the children's needs, would provide appropriate care.  It is also unclear how mother would ensure that the children attended school and medical appointments.  Safety remained a concern as well; again, mother had a history of unsuitable housing and lacked suitable housing at the time of termination.

In sum, a preponderance of the evidence established that termination of mother's parental rights was in the children's best interests.  The trial court did not clearly err by terminating mother's parental rights.[5]

Affirmed.

/s/ Randy J. Wallace
/s/ Michelle M. Rick
/s/ Kristina Robinson Garrett

---

[5] JDC's and KDS's legal fathers were reportedly working on CSPs at the time of termination. Nevertheless, the evidence establishes that termination of mother's parental rights was proper for the reasons already discussed.  Importantly, "the parental rights of one parent may be terminated without the termination of the parental rights of the other parent. . . ."  *In re Medina*, 317 Mich App 219, 232; 894 NW2d 653 (2016) (quotation marks and citation omitted).